Argued and submitted April 3, 1985, reassigned January 31, Court of Appeals reversed, remanded to Fair Dismissal Appeals Board February 11, reconsideration denied March 18, 1986

ROSS,
*Petitioner on Review,*

*v.*

SPRINGFIELD SCHOOL DISTRICT
NO. 19,
*Respondent on Review.*

(FDAB 80-1; CA A29074; SC S31480)

716 P2d 724

Robert D. Durham, Portland, argued the cause for petitioner on review. With him on the petition was Kulongoski, Durham, Drummonds & Columbo, Portland.

John C. Volmert, Springfield, argued the cause for

respondent on review. With him on the response was Wurtz, Logan & Logan, Springfield.

James M. Campbell, Eugene, filed a brief *amici curiae* and memorandum *amicorum curiae* for Gay and Lesbian Alliance of the University of Oregon and Eugene Chapter of National Lawyers Guild, Eugene. With him on the brief and memorandum was Goldstein & Campbell, Eugene.

Edward C. Harms, Jr., Springfield, filed a brief *amicus curiae* for Oregon School Boards Association.

LINDE, J.

Campbell, J., filed a dissent, joined by Peterson, C. J. and Jones, J.

**LINDE, J.**

This case is before the court for the second time. In *Ross v. Springfield School Dist. No. 19,* 294 Or 357, 657 P2d 188 (1982), we reversed an order of the Fair Dismissal Appeals Board sustaining the respondent school district's dismissal of petitioner, a school teacher, which was partly based on grounds of immorality in the form of sexual conduct in a booth in a self-styled "adult bookstore." Our first opinion reached a number of conclusions. Application of the standards stated in ORS 342.865(1) (which, in paragraph (b), includes "immorality") is "interpretive rather than legislative." 294 Or at 367. It does not require specification by prior rulemaking. ORS 342.865(2) provides that "consideration shall be given" to standards adopted by local school boards, but the Springfield school board had attempted no statement of standards of immorality. 294 Or at 368. "The statute places primary interpretive responsibility with the FDAB," which "has chosen to interpret immorality by means of an order in this case." 294 Or 368-69.

We held that FDAB's order was inadequate because "FDAB nowhere set forth any basis upon which it might have concluded that petitioner's conduct violated that standard" (*i.e.,* "immorality") and lacked any "rationale to support the conclusion that petitioner's conduct was immoral." 294 Or at 370.

On remand, FDAB issued a new order, which again sustained petitioner's discharge for "immorality." The order contained findings of fact concerning the circumstances summarized in our first opinion, followed by conclusions of law which (somewhat condensed) stated:

"The panel interprets the word immorality in the statute as including reprehensible sexual conduct by a teacher * * *.

"[In the absence of rules] the panel concludes that the sexual conduct, to constitute immorality under the statute, must violate either the moral standards of the school community or the moral standards of the people of the state of Oregon * * *.

"Privacy is a well-known requirement of society for sexual activity. Engaging in sexual intercourse publicly is universally condemned. In this case, appellant's engaging in sexual intercourse in a commercial establishment without a reasonable

attempt to assure complete privacy is activity so reprehensible and so universally condemned that appellant was bound to know it would violate, as we conclude that it did, the standard of sexual privacy of both the people of Oregon as a whole and the school community. The parent letters [in the record] support this conclusion * * *.

"In summary, immorality under ORS 342.865 may be shown by a violation of the moral standards of the people of the State of Oregon generally or the moral standards of the school community where the teacher is employed. Both condemn engaging in intercourse and copulation in a commercial establishment not offering privacy for such purposes and in an area in such establishment where such intercourse or copulation can be readily observed by other members of the public on the premises * * *.

"Appellant's conduct thus constituted immorality under ORS 342.865 and the unfitness caused and demonstrated by such conduct justified respondent's decision to dismiss him."[1]

On appeal, the Court of Appeals again affirmed FDAB's order, holding that "FDAB's interpretation of 'immorality' to include 'reprehensible sexual conduct by a teacher' is not erroneous, nor is its implicit additional interpretation that engaging in sexual intercourse publicly is reprehensible sexual conduct." 71 Or App 111, 114, 691 P2s 509 (1984). The court added in a footnote:

"This additional interpretation is based on FDAB's determination that such activity is universally condemned and thus violates the state's moral standards. The basis for this determination does not appear in the record, but we do not believe that it needs to do so. Neither FDAB nor this court requires evidence to show that public sexual intercourse violates community moral standards."

*Id.* at 114 n 1. The court divided on the issue whether petitioner's conduct was "public" so as to allow FDAB to base its order on that premise about "immorality." *See* 71 Or App

---

[1] We have omitted conclusions stating that immorality as a ground for dismissal must 'negatively affect the ability of the teacher to carry out his or her required responsibilities' and that the teacher must have 'actual or constructive notice of the moral standard in question,' which is satisfied if the teacher should know that the conduct is 'universally condemned' or 'would cause a strong negative reaction against him in the community.' We also have omitted long passages that are not in the form of conclusions of law but in the form of an opinion discussing the evidence and the appellant's contentions.

at 117 (Gillette, J., dissenting). We allowed review to examine whether FDAB and the Court of Appeals had adequately and correctly identified the nature and source of the judgment of "immorality" that ORS 342.865(1) entrusts to FDAB.

## I. FDAB'S RESPONSIBILITY

As the foregoing quotations show, FDAB believed that it was applying "the moral standards of the people of the state" or perhaps of the school community. The Court of Appeals glossed over the question of the relevant standards by referring to "community" moral standards.

In *Megdal v. Board of Dental Examiners,* 288 Or 293, 605 P2d 273 (1980), we had before us a similar problem involving agency interpretation of the statutory term "unprofessional conduct." We noted that "unprofessional conduct" might refer to what the legislature considered unprofessional conduct for dentists, or what the dental profession widely regards as such, or what the Board of Dental Examiners considered to be unprofessional conduct in exercising the interpretive responsibility delegated to it. *Megdal,* 288 Or at 304. For reasons to which we return below, we held that the statute intended the Board itself to decide what is unprofessional conduct rather than to determine what others might regard as such. By way of contrast, in another decision interpreting a similar statutory test of professional misconduct, we held that "moral turpitude" referred to a standard intrinsic to the legislation itself rather than to what either the court or members of the legal profession might regard as immoral. *In re Chase,* 299 Or 391, 702 P2d 1082 (1985).

In this case, therefore, we put the following question to counsel:

"In ORS 342.865, does 'immorality' refer to (1) what the legislature deemed immoral, or (2) what the Fair Dismissal Appeals Board, under delegated authority, deems immoral, or (3) what persons outside the legislature or the Board deem immoral, as determined by the Board?"

We further asked (a) whether there was a basis for concluding that the legislature meant FDAB to look either to local or to state-wide public opinion, (b) who would be included within the relevant public, (c) whether FDAB's apparent "official

notice" of public opinion should have followed required procedures, and (d) whether "immorality" referred to behavior condemned specifically for teachers, or for other social categories, or only behavior condemned for people generally.[2]

The answer to these questions is important to the administration of the fair dismissal law.

Difficult issues arise if the law is viewed as incorporating moral standards of private individuals or social groups external to the agency to which the legislature has delegated the duty to interpret and apply the statutory standard. Among these issues are whether "immorality" refers to what people profess or what they do, and what part of the public is entitled to set standards of morality for the population as a whole. There are issues whether "immorality" refers to conduct that those admitted to the standard-setting "public" consider immoral for themselves, or more particularly for their children, or for school teachers, or for one sex but not the other.

---

[2] The questions sent to counsel were:

1. "In *Megdal v. Board of Dental Examiners,* 288 Or 293 (1980), this court noted (at 304) that the statutory term "unprofessional conduct" might refer (1) to norms that are widely recognized in the profession "apart from the views of the agency itself and in this sense 'external' to the law," or (2) to the legislature's own standard rather than to external sources, or (3) to a standard for delegated specification by the agency itself; and the court held that the statute in that case was meant in the third sense.

"In ORS 342.865, does 'immorality' refer to (1) what the legislature deemed immoral, or (2) what the Fair Dismissal Appeals Board, under delegated authority, deems immoral, or (3) what persons outside the legislature or the Board deem immoral, as determined by the Board?

2. "In this case, the Board apparently took the third view of the statute, stating that 'immorality under ORS 342.865 may be shown by a violation of the moral standards of the people of the State of Oregon generally or the moral standards of the school community where the teacher is employed,' and the Court of Appeals approved this interpretation. (a) If ORS 342.865 refers to views of morality held by the public, is there a basis for concluding that the legislature meant either a state-wide or a local public? (b) Who (apart from geography) are members of the relevant public, and how are their views to be determined in a case that the Board does not deem indisputable? (c) If public opinion is a fact to be shown case by case, can inconsistent results on different evidence concerning identical conduct be avoided? If the fact of general public condemnation is to be established by the Board's taking official notice, should the Board have followed ORS 183.450? *See Megdal, supra,* 288 Or at 306.

3. "Regardless of the answer to Question 1, *supra,* does 'immorality' refer to behavior condemned specifically for teachers, or condemned for certain social categories of sex, age, employment, or marital status, or only to behavior condemned for people generally?"

The Court of Appeals, in the passage we have quoted, avoided these issues and allowed FDAB to avoid them on the grounds that FDAB needed no basis in the record to determine that the conduct in this case "is universally condemned and thus violates the state's moral standards." But the legal issues cannot be swept under the rug simply because a court thinks that the outcome of a particular case is obvious. School boards, teachers, and FDAB must know what the statute means when the outcome does not seem obvious to everyone.

In one recent episode, for instance, two school board members faced a recall election initiated because they allegedly lived together out of wedlock. The recall was reported to have failed by a vote of 328-312. Salem Statesman-Journal, May 22, 1985, page 1A. If that school board discharged two school teachers for unmarried cohabitation, what should FDAB do if "community judgment" were its criterion of "immorality?"

There was a time when "the public" would condemn women school teachers, though not men, for smoking tobacco in public. What is the current moral status of smoking marijuana? Of being drunk in public?

Gambling long has met public disapproval reflected in prohibitory laws. Has its moral stigma been lifted when a majority of voters amend the constitution to institute a state lottery?[3] Does the public think it more moral to pay a gambling debt or not to pay it, as the law provides? *See* ORS 465.090.

Homosexual relations in private are a crime in much of the country, but Oregon abolished the crime in 1971. Or Laws (1971), ch 743, §432. Does "the public" in Oregon now regard them as immoral? Is having an abortion immoral? Adultery or promiscuity? Failure to keep up child support payments? Lying, cheating or plagiarism?

These examples show the importance of a clear understanding of the responsibility that the legislature placed in FDAB: whether FDAB itself bears the responsibility of

---

[3] Article XV, Section 4 of the Oregon Constitution was adopted in the November 1984 election in Oregon by a vote of 794,441 in favor of the establishment of a state lottery and 412,341 against.

interpreting and giving content to the legislature's standard or whether it may deflect that responsibility into a search for popular opinion. FDAB's opinion in this case rests on the second view. It is, of course, possible that the legislature might direct a tribunal to determine what the "moral standards of the people of Oregon" are as a fact in a contested case. But we believe that settling disputed instances of "immorality" as an issue of fact creates such obvious difficulties that it seems unlikely that this was what the legislature intended.

If "immorality" is to be determined as a fact by reference to the views of "the public," the determination would take the form of findings of fact, required by ORS 183.470, which would have to be supported by substantial evidence in the record. It is not easy to describe what the nature of the evidence would be and what direct and crossexamination of what witnesses on the question of the population's standards of morality should be admitted or excluded. Should a minister qualify as an expert but not a bartender? Nor are social facts within the "specialized knowledge" of the FDAB and therefore subject to official notice under ORS 183.450(4) if the parties were given an opportunity to contest the facts to be noticed. FDAB is not an agency of specialists in morality, and we doubt that it would even attempt to deal with examples such as those we have mentioned by making findings of fact based only on official notice.[4] Neither would a

---

[4] In *McPherson v. Employment Division*, 285 Or 541, 591 P2d 1381 (1979), we distinguished between the concept of "expertise" and specialized responsibility in interpreting a broad statutory standard (there "good cause" for leaving employment, ORS 657.176(2)(c)):

"* * * Judicial respect for an agency's interpretation of a legal term, though it is a question of law, is often explained on a theory of agency 'expertise.' That may apply where statutory terms are drawn from a technical vocabulary which takes its meaning from a particular science, industry, trade, or occupation in which the agency has genuine expertise, but an agency's administration of a specialized program does not mean that its political head or changing personnel either need or acquire expertise in that sense. * * *

"Distinct from such agency 'expertise' in giving meaning to a technical or specialized terminology is the question how far the statutory term entrusts to the agency some range of choice in carrying out the legislative policy. * * *" (Footnotes omitted.)

285 Or 549-50. We continued:

"* * * Like standards such as 'fair' or 'unfair,' 'undue' or 'unreasonable,' or 'public convenience and necessity,' 'good cause' in its own terms calls for completing a value judgment that the legislature itself has only indicated: evaluating what are

court, if called upon to apply an indeterminate legal standard like "immorality," treat this as a matter of evidence or judicial notice of facts rather than as a matter of delegated judgment, unless the legislature plainly so intended.

These considerations, along with the added issue of delegating the meaning of a legal standard to the private members of a profession or other group, led us to conclude in *Megdal* that when the legislature delegated the determination of unprofessional conduct to the Board of Dental Examiners, "it intended the board to exercise responsibility for those standards itself rather than to look to private practitioners or associations in order to determine what their standards are." 288 Or at 306.

The members of FDAB may be as uncomfortable as school board members or judges when asked to settle disputes about morality. Awareness of the problems that this creates might give legislators pause before using "moral" or "immoral" as statutory standards, at least without further elucidation. But the indeterminacy of the standard is no reason to assume that the answer is to be sought as a fact of public opinion. Indeterminate standards such as "fair and equitable" or "public convenience and necessity" have long been used in public utility regulation without leading agencies to locate their meaning by looking for community standards of "fairness" or "convenience." Evidence can show the effects of different rate structures or of new or discontinued services on producers, consumers, competitors, or communities; but without further legislative direction it is understood to be the agency's responsibility, within legal limits, to judge the fairness or the convenience of those effects, for instance whether rates should be strictly proportional to use, or include a basic minimum irrespective of use, or provide some services at uneconomic rates to persons or localities dependent on them.

Similarly, FDAB is responsible for deciding on the

---

'good' reasons for giving up one's employment and what are not. Judicial review of such evaluations, though a 'question of law,' requires a court to determine how much the legislature has itself decided and how much it has left to be resolved by the agency. For an agency decision is not 'unlawful in substance,' ORS 183.482(8), *supra,* if the agency's elaboration of a standard like 'good cause' is within the range of its responsibility for effectuating a broadly stated statutory policy."

criteria that make conduct immoral without looking for community opinion on immorality. The effort is hardly advanced by defining one epithet by another, for instance, that conduct is immoral if it is reprehensible. Criteria are not an exhaustive list of specific disapproved conduct. For instance, FDAB might conclude that conduct is immoral only if the conduct gives rise to potential criminal or civil liability, or if it intentionally harms others, or also unintentionally when it harms persons toward whom the actor has some special responsibility, or even when the conduct causes no tangible harm except offense to canons of civility and good taste, always assuming that its criteria stay within the bounds of the statutory policy. We do not prescribe any of these tests. Evidence can show whether particular conduct in fact fails FDAB's test for immorality, but the test itself is not established by evidence.

## II. FDAB'S PROCEDURAL OPTIONS

The difficulty of FDAB's assignment is exacerbated by its structure. FDAB consists of 20 members appointed from specified categories and serving part time. Five members must be public school administrators, five teachers, five school board members, five must have no occupational affiliation with a school district, and each category must be further distributed by size of school district. ORS 342.930(1).[5] Hearings in individual cases are held by panels of three members selected to reflect this composition of the board as a whole. ORS 342.905(3). The statute provides that FDAB may act as a whole by a majority of its members, ORS 342.930(7), but it does not expressly describe the type of action or state whether it includes *in banc* decisions of difficult cases.[6]

Our previous opinion held that "[t]he statute places primary interpretive responsibility with the FDAB," that it "may interpret statutory standards either by an interpretive rule or by order in a contested case," and that FDAB's choice

---

[5] Problems of interest representation on public agencies are discussed in *Megdal, v. Board of Dental Examiners,* 288 Or 293, 307, 605 P2d 273 (1980), and in *City of Roseburg v. Roseburg City Firefighters,* 292 Or 266, 292-95, 639 P2d 90 (1981) (Linde, J., concurring).

[6] Although most of ORS 342.905 refers to hearings by a "panel," subsection (8) provides for an appeal "from action of the Fair Dismissal Appeals Board" rather than from a "panel."

to proceed by an order in this case was permissible, because "[n]o requirement for prior rulemaking exists." *Ross,* 294 Or at 368-69. If an agency proceeds by an order in a contested case, however, it must articulate a tenable basis for the legal conclusions by which it applies a statute to the facts.[7] Reasoned orders in contested cases not only serve to assure proper application of the law in the individual case. In the absence of interpretive rules, they also are the only source of guidance for agency personnel as well as for persons governed by the statute and the only way to develop and maintain the consistency of its administration that is postulated in ORS 183.484(4)(b)(B).[8]

    *Trebesch v. Employment Division,* 300 Or 264, 710 P2d 136 (1985), also presented a problem how an agency, there the Employment Division, was to develop and maintain consistent interpretation of a broad statutory standard, though the standard ("systematic and sustained effort to obtain work," ORS 657.325(10)) was substantially less indeterminate than "immorality." As in this case, we were unable to find any legislative directive that the standard be applied only after prior rulemaking, although the responsible administrator, the Assistant Director of the Employment Division, had authority to make rules interpreting the statute. The difficulty lay in determining whether the structure and caseflow processes in the Employment Division included an opportunity for the

---

    [7] We quoted from *Springfield Education Association v. Springfield School District,* 290 Or 217, 227, 621 P2d 547 (1980):

    "* * * The requirement of ORS 183.470 that the order contain findings of fact and conclusions of law is a requirement that the reasoning by which the agency applies a statute to facts to reach a result be expressed in the order. * * * If the statute requires interpretation, * * * the interpretation and the agency's rationalization of it are properly a part of the reasoning of the order. Thus, under ORS 183.470, the order itself is the instrument by which an agency demonstrates that a particular interpretation or application of a statute is within a generally expressed legislative policy."

*Ross v. Springfield School Dist. No. 19,* 294 Or at 370.

    [8] ORS 183.484(4)(b)(B) provides:

    "The court shall remand the order to the agency if it finds the agency's exercise of discretion to be:

    "* * * * *

    "(B) Inconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency."

assistant director to achieve by published opinions in contested cases the consistent agency interpretation of statutory standards that otherwise could be accomplished only by rulemaking. We concluded:

> "It appears that the statutory provision for reconsideration for '[e]rrors caused by misapplication of law by the division' contemplates interpretation of law apart from review for factual inaccuracies and arithmetic miscalculations. If this is so, then we can discern no clear indication in the legislation that rulemaking is required."

300 Or at 276-77. The case was remanded to the Employment Appeals Board to allow the claimant to seek reconsideration.

Here the structural problem is different. Unlike the Employment Division, FDAB does not have many field offices throughout the state administering a large number of claims, many of them routine. As stated above, FDAB acts through panels of its members, each of which is constituted *ad hoc* to hear and decide one of a relatively small number of cases. Nevertheless, the board members collectively are a single agency administering the same statute, and the board must have some means of giving the statute a consistent interpretation.

As in *Trebesch,* the choice lies between interpretive rulemaking and adherence to reasoned interpretations expressed in deciding contested cases. Our earlier opinion said that FDAB was not required to make rules in advance of deciding contested cases, not that FDAB could not do so or that rulemaking might not be the best procedure. ORS 342.915(2) provides that a hearing "shall be conducted in accordance with rules adopted by the Fair Dismissal Appeals Board pursuant to ORS 183.310 to 183.550." The legislation therefore assumes that FDAB's structure lends itself to collective rulemaking. Nothing prevents FDAB from refining its view of the statutory standard by rulemaking; agencies do not need express statutory authority to publish their interpretations of the statute for which they are responsible in forms that qualify as "rules" under ORS 183.310(8).

FDAB nevertheless may be reluctant collectively to consider and adopt its own criteria of "immorality" by rulemaking in advance of concrete cases. If FDAB chooses to state its criteria only in the course of deciding cases, it needs to

find a way to assure that different panels follow the criteria so developed or give adequate reasons for departing from an earlier interpretation. *See* ORS 183.355(5), 183.484(4)(b)(B). Perhaps FDAB could adapt to its own use procedures such as those of the Court of Appeals, which also hears cases only in panels, for *in banc* discussion of difficult or doubtful legal issues, while recognizing that ORS 342.905(5) contemplates that the individual cases will be decided by a panel. The statute neither prescribes nor excludes ways for FDAB to address the task of defining "immorality" with which the legislature has charged it.

## III.  CONCLUSION

The Court of Appeals erred in sustaining FDAB's assumption that its task was to find "community moral standards" as a fact, and that the fact in this case needed no evidence. Because the court and FDAB were satisfied that the outcome in this case could not be in doubt, they did not stop to consider the implications of that approach when "community moral standards" are in doubt. "Easy" cases make bad law.

It is regrettable that final resolution of this case has been delayed, as the dissent notes. Perhaps the Court's first opinion might have anticipated and included further guidance on the statutory issue. Possibly FDAB would have reached the same result on its own responsibility, without reference to public opinion. Some passages of its order suggest as much; but the order was based, and was sustained by the Court of Appeals, on the erroneous premise stated above. A reviewing court cannot affirm an order on the grounds that the judges themselves would reach the same result under the correct premise or believe that FDAB would do so, unless the result is compelled as a matter of law. But the legislature has entrusted the determination of "immorality" to FDAB, not to the courts beyond the ordinary function of judicial review.

Because FDAB's order confused interpretive with fact-finding approaches to the statutory standard, we must once more remand the order to FDAB for decision pursuant to a correct understanding of its statutory responsibility. Petitioner is entitled to be heard on criteria for FDAB's interpretation of "immorality," but no further evidence need be taken unless a criterion used by FDAB requires it.

The Court of Appeals is reversed, and the proceeding is remanded to FDAB.

**CAMPBELL, J.** dissenting.

I dissent. The Fair Dismissal Appeals Board (FDAB) determined that "immorality" includes public sexual intercourse. What the majority finds objectionable is not that determination or its application to the facts, but rather FDAB taking notice of the public standards of morality. However, petitioner never objected either in his brief to this court or the Court of Appeals to FDAB taking notice that public sex violates the moral standards of the people of Oregon, but instead argued other points. He denied that his conduct was "public," disputed that there was a nexus between his conduct and his fitness to teach, raised constitutional issues and argued that a statewide standard should be used to interpret the term "immorality." The majority is apparently deferring discussion of these issues until *Ross* III.

When this court submitted questions to the parties regarding the procedures applicable to "official notice of public opinion," it was raising a point not previously involved in the litigation. The FDAB was correct in responding:

"* * * Petitioner has never claimed as error that the FDAB violated 183.450(4) [relating to official notice]. With all due respect to this Court, Respondent is fascinated and somewhat disturbed by this Court's apparent willingness to consider a statute and a point that has not been raised, discussed or briefed by Petitioner in any of the many briefs or memoranda previously submitted to judicial or administrative bodies in this case. Respondent need not cite authority for the proposition [that] the Courts are to determine only the issues raised and represented by the Appellant. If the Court does determine an issue not raised by Petitioner, Respondent asks the Court to advise the parties and the Bar in its opinion why it feels compelled to depart from this well-established judicial tradition."

The majority's goal, which is laudable, is that "school boards, teachers and FDAB must know what the statute means when the outcome does not seem obvious to everyone." 300 Or at 513. That objective, however, is not satisfied by the procedures the majority specifies. According to the majority, the FDAB must interpret "immorality" without considering

prevailing moral standards. Rather, the majority implies that the individual members are to define "immorality" based on their own personal views. There is no reason to believe that the legislature intended that the employment future and reputation of teachers be based on such a precarious and potentially arbitrary footing. The personal views of the members may be unknown in advance, because "immorality" may be interpreted by means of an order rather than through rule-making. Their views may be excessively stringent in comparison with the general society, or idiosyncratic. It is possible to imagine that the three individuals who comprise the panel in a particular hearing would believe, using the majority's example, that women teachers who smoke tobacco in public are immoral.

Focusing on an issue that was never raised by any party in this litigation will further delay a final resolution of litigation that has already comprised a full seven years from the precipitating incident and involved a previous remand for reconsideration from this court. The task assigned to FDAB by this second remand, coupled with uncertainties in the standards established by the majority, may well lead to still further petitions to this court and further remands.

The legal system should be extremely embarrassed with the length of time this case has been in litigation. It is an even-money bet that we will see *Ross* III. Who is to say that there will not be a *Ross* IV and a *Ross* V. It is doubtful that we will pass the Super Bowl designation. It stands at XX and adds one number each year—a faster pace.

The Court of Appeals decided this case based on issues raised by the parties. I would affirm the result of the Court of Appeals.

Peterson, C. J., and Jones, J., join in this dissent.