Argued and submitted October 8, 1986, affirmed January 21, 1987

STATE OF OREGON,
*Petitioner on Review,*

*v.*

EARL A. HENRY,
*Respondent on Review.*

(CC 31-300; 31-301; CA A26439; SC S32941)

732 P2d 9

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for petitioner on review. Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Solicitor General, and Virginia L. Linder, Assistant Solicitor General, Salem, filed the petition for review.

Timothy J. Sercombe, of Harrang, Swanson, Long & Watkinson, Eugene, and Rex Armstrong, Portland, argued the cause for respondent on review. On the response to the petition for review with Mr. Armstrong was Edward E. Hill, of Larry O. Gildea, P.C., Eugene.

Before Peterson, Chief Justice, and Lent, Linde, Campbell, Carson and Jones, Justices.

JONES, J.

## JONES, J.

Shortly after defendant Earl Henry opened an adult bookstore in Redmond, Oregon, a search warrant was issued by a Deschutes County district judge which resulted in the seizure of almost the entire inventory of the store, including 73 magazines, 142 paperback books, seven newspapers, nine films, one film projector, six decks of playing cards, an additional six periodical magazines, and various business records. Defendant was charged with disseminating obscene material and possession of obscene material with the intent to disseminate under ORS 167.087, which provides in pertinent part:

"(1)   A person commits the crime of disseminating obscene material if the person knowingly makes, exhibits, sells, delivers or provides, or offers or agrees to make, exhibit, sell, deliver or provide, or has in his possession with intent to exhibit, sell, deliver or provide any obscene writing, picture, motion picture, films, slides, drawings or other visual reproduction.

"(2)   As used in subsection (1) of this section, matter is obscene if:

"(a)   It depicts or describes in a patently offensive manner sadomasochistic abuse or sexual conduct;

"(b)   The average person applying contemporary state standards would find the work, taken as a whole, appeals to the prurient interest in sex; and

"(c)   Taken as a whole, it lacks serious literary, artistic, political or scientific value."

A jury found defendant guilty of dissemination of obscene material and possession of obscene material with the intent to disseminate. Judgment was entered on the two convictions and in each case defendant was fined $1,000 and sentenced to imprisonment for 30 days with the jail sentences to run consecutively. Execution of the sentences was stayed pending appeal.

Defendant raised four issues in his appeal to the Court of Appeals: (1) The search and seizure violated state and federal constitutions; (2) the trial court erred in excluding comparable evidence; (3) the jury verdicts were inconsistent as a matter of law; and (4) ORS 167.087 is unconstitutional under Oregon Constitution, Article I, section 8.

The Court of Appeals reversed the convictions, holding that ORS 167.087 is unconstitutionally vague. Defendant had not made an argument based on vagueness apart from his claim under Article I, section 8, but we understand the Court of Appeals opinion to have seen the two issues as related. Although we proceed to decide the constitutional issue as presented, we should say a word about the vagueness issue.

The indeterminacy of the crime created by ORS 167.087 does not lie in the phrase "sexual conduct" that is further defined in ORS 167.060(10).[1] It lies in tying the criminality of a publication to "contemporary state standards."[2] Even in ordinary criminal law, we doubt that the legislature can make it a crime to conduct oneself in a manner that falls short of "contemporary state standards." In a law censoring speech, writing or publication, such an indeterminate test is intolerable. It means that anyone who publishes or distributes arguably "obscene" words or pictures does so at the peril of punishment for making a wrong guess about a future jury's estimate of "contemporary state standards" of prurience.

Though we do not disagree with the Court of Appeals, we hold that in any event ORS 167.087 contravenes Article I, section 8, of the Oregon Constitution and cannot be justified as an "historical exception" from Oregon's constitutional guarantee of freedom of expression.

Article I, section 8, of the Oregon Constitution sets forth in plain words that

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

What does the expression "every person shall be responsible for the abuse of this right" mean? This court

---

[1] ORS 167.060(10) provides:

" 'Sexual conduct' means human masturbation, sexual intercourse, or any touching of the genitals, pubic areas or buttocks of the human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification."

[2] For the intrinsic difficulties of such a standard, *cf. Ross v. Springfield School Dist. No. 19,* 300 Or 507, 716 P2d 724 (1986).

obliquely addressed that language in *State v. Jackson,* 224 Or 337, 347, 356 P2d 495 (1960). There Justice George Rossman related this final clause of the section to the statement in Blackstone's Commentaries that the "liberty of the press" extended only to freedom from "previous restraints upon publications, and not in freedom from censure for criminal matter when published." 4 Blackstone, Commentaries, ch 11, p 142, 151. But Article I, section 8, does not in terms refer to "freedom of * * * the press" (as the First Amendment does),[3] and Blackstone's narrow view of the extent of freedom of publication has long been rejected in this country as inadequate to the intended sweep of the American guarantees. Since *State v. Jackson,* this court has related the clause holding every person "responsible for the abuse of" the right of free expression to civil responsibility for harm done thereby. *Wheeler v. Green,* 286 Or 99, 118, 593 P2d 777 (1973). If the "abuse" clause leaves one subject to criminal prosecution for publications, it could hardly be confined just to "obscene" publications. The clause does not affect the decision of the case before us.

We have recently said in *State v. Robertson,* 293 Or 402, 649 P2d 569 (1982), and *In re Lasswell,* 296 Or 121, 673 P2d 855 (1983), that the guarantee of freedom of expression of the Oregon Constitution forecloses the enactment of any prohibitory law backed by punitive sanctions that forbids speech or writing on any subject whatever, unless it can be shown that the prohibition falls within an original or modern version of an historically established exception to the protection afforded freedom of expression by Article I, section 8, that this guarantee demonstrably was not intended to displace.

ORS 167.087 as adopted by the legislature captured the obscenity test set forth by the Supreme Court of the United States in *Miller v. California,* 413 US 15, 93 S Ct 2607, 37 L Ed 2d 419 (1973). Defendant concedes that the statute passes muster under the federal Court's current view of the First Amendment and therefore focuses his attack directly on the viability of the statute under Article I, section 8, of the

---

[3] The First Amendment to the United States Constitution provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Oregon Constitution. We therefore address this issue as our own interpretation of the Oregon Constitution independent of any First Amendment analysis by the Supreme Court of the United States. *See State v. Kennedy,* 295 Or 260, 265-68, 666 P2d 1316 (1983). We discuss the federal constitution and federal cases only when of assistance in the analysis of the Oregon Constitution.

We note that Article I, section 8, separately precludes laws "restraining the free expression of opinion" as well as laws "restricting the right to speak, write, or print freely," whereas the First Amendment restrains "abridging the freedom of speech, or of the press." The text of Article I, section 8, is broader and covers any expression of opinion, including verbal and nonverbal expressions contained in films, pictures, paintings, sculpture and the like. The Oregon constitutional provision also covers "any subject whatever" and does not contain any express exception for obscene communications.

The question remains whether "obscene" expressions fall within such historical exceptions as "perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants." *State v. Robertson, supra,* 293 Or at 412.

The first part of the *Robertson* test for determining whether a restriction on expression comes within an historical exception focuses on whether the restriction was well established when the early American guarantees of freedom of expression were adopted, *i.e.,* by the late eighteenth and midnineteenth centuries. Laurence Tribe, American Constitutional Law 657 (1978), reports:

> "In the sixteenth century, ecclesiastical and royal censorship of expression in England was more concerned with political and religious themes than with the sexually obscene. The earliest licensing systems were primarily addressed to the vices of sedition and heresy. During the seventeenth century, the influence of puritanism resulted in a sober intolerance of bawdy literature; the portrayal of sexual pleasure was strictly condemned. Shortly after the restoration, in the year 1663, Sir Charles Sedley, an intimate of the King and a notorious profligate, after a drinking spree in a tavern by Covent Garden, mounted the balcony of the tavern as a crowd gathered below. There he proceeded to disrobe, haranguing his audience with antireligious epithets as he showered them with bottles of

urine. The crowd, now turned mob, stormed the tavern. Sedley's subsequent conviction [Sir Charles Sydlyes Case, 1 Keble 620 (K.B. 1663). See 8 The Cambridge History of English Literature 158 (1912)] is widely regarded as the first reported English case on obscenity—making Sedley the first adjudicated 'streaker.' * * * Sedley's * * * case was subsequently relied upon in *Dominus Rex v. Curl* [2 Strange 788 (K.B. 1727)] for the proposition that obscenity alone—that is, Sedley's nakedness—was a breach of the peace. In a third early case, *Rex v. Wilkes* [4 Burr. 2527 (K.B. 1770)], the Tory government used the new common law of obscenity to send Wilkes, a whig foe, to jail for having published a poem entitled 'Essay on Woman.' There was little further common law development in England; there was no common law development in the American colonies at all. And at the time of the revolution, only one state [Massachusetts] had any statutory law on the subject." (Text of some footnotes in brackets; others omitted.)

*See also* U.S. Dept. of Justice, Attorney General's Commission on Pornography 236-40 (Regulation and the Role of Religion) (1986).

The Massachusetts statute addressed pornography as a sacrilegious work. In 1711 the colony of Massachusetts enacted a statute stating that "evil communication, wicked, profane, impure, filthy, and obscene songs, composures, writings, or prints do corrupt the mind and are incentives to all manner of impieties and debaucheries, more especially when digested, composed or uttered in imitation or in mimicking of preaching or any other part of divine worship." Ancient Charter, Colony Laws and Province Laws of Massachusetts Bay (1814). The law prohibited the "composing, writing, printing, or publishing of any filthy, 'obscene or profane story, pamphlets, libel or mock sermon, in imitation of preaching or any other part of divine worship." Despite this enactment, there were no reported obscenity prosecutions until 1815. The first reported obscenity case in the United States is *Commonwealth v. Sharpless,* 2 Serg & Rawle 91 (1815). The Pennsylvania court relied on *Sir Charles Sydlyes Case*[4] and found crimes against public decency to be indictable at common law.

---

[4] There are two different reports of this case: 1 Keble 620 (KB), 83 Eng Rep 1146 (1663), and 1 Sid 168, 82 Eng Rep 1036 (1663). This and many of the other early cases are reprinted in De Grazia, Censorship Landmarks (1969).

.

The first case involving a book alleged to be obscene arose in Massachusetts six years later. Peter Holmes was charged with publishing a lewd illustration along with the book "Memoirs of a Woman of Pleasure." *Commonwealth v. Holmes,* 17 Mass 336 (1821). Relying on both the common law and the statute, the Massachusetts court convicted Holmes.

Tribe, *supra* at 658, reports that several states, beginning with Vermont in 1821, subsequently passed obscenity statutes. The first federal statute, passed in 1842, was aimed at the "French post card" trade and prohibited the importation of obscene pictorial matter. 5 Stat 566 (1842). Tribe continues:

> "Few of the cases prior to the late nineteenth century attempted to define the obscene. In 1868, in *Regina v. Hicklin,* Lord Chief Justice Cockburn was called upon to provide a definition under the recently enacted Lord Campbell's Act. For him, the 'test of obscenity' was 'whether the tendency of the matter charged . . . is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall.' [L.R 3 Q.B. 360, 368 (1868).]"

> "The *Hicklin* test[5] was widely adopted by American courts. * * * [P]rosecutions under the *Hicklin* rule took a heavy toll on contemporary literature. In * * * 1930, * * * Theodore Dreiser's *An American Tragedy* [Commonwealth v. Friede, 271 Mass. 318, 171 N.E. 472 (1930)] and D. H. Lawrence's *Lady Chatterly's Lover* [Commonwealth v. Delacey, 271 Mass. 327, 171 N.E. 455 (1930)] were declared obscene." Tribe, *supra* at 658-59 (text of some footnotes in brackets; other footnotes omitted).

---

[5] The *Hicklin* rule had been under attack for some time prior to 1930. In 1913, Judge Learned Hand criticized the *Hicklin* test in *United States v. Kennerley,* 209 F 119 (SD NY 1913), questioning whether the treatment of sexual topics should be reduced to the standard found in a child's library. Twenty years later, Judge Augustus Hand rejected *Hicklin* completely and ruled that excerpts of a work could no longer be used to determine obscenity. *United States v. One Book Entitled "Ulysses,"* 72 F2d 705 (2d Cir 1934).

It was not until 1948 that the Supreme Court squarely faced the contention that legal restraints on the publication of obscenity were unconstitutional violations of the First Amendment's guarantees of freedom of speech and press. In that year Doubleday & Co. was convicted under a New York law for having published an allegedly obscene work, Edmund Wilson's "Memoirs of Hecate County." Despite the fact that Wilson was a leading literary critic, the conviction was upheld by an evenly divided court. *Doubleday & Co. v. New York,* 335 US 848, 69 S Ct 79, 93 L Ed 398 (1948).

The United States Supreme Court addressed the history of obscenity laws in *Roth v. United States,* 354 US 476, 77 S Ct 1304, 1 L Ed 2d 1498 (1957). Justice Brennan, in his first year on the Supreme Court, wrote that "obscenity is not within the area of constitutionally protected speech or press," relying on an excerpt from *Chaplinsky v. New Hampshire,* 315 US 568, 572, 62 S Ct 766, 86 L Ed 1031 (1942), which had excluded "the lewd and obscene [and] the profane" from the category of protected speech. *Roth,* 354 US at 485. Thus, for the first time the United States Supreme Court opined that "obscenity" was without First Amendment protection. The Court stated that "implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance." 354 US at 484. Justice Brennan noted that the Court "has always assumed that obscenity is not protected by the freedoms of speech and press," but he admitted that *Roth* was the first time the question had been squarely presented to the Court under the First or the Fourteenth Amendment. 354 US at 481. Brennan attempted to justify his conclusion that obscenity was not historically protected by quoting statutes relevant to libel, blasphemy and profanity, and then coupled those references with a side reference to the 1712 Massachusetts statute that we previously cited which made it criminal to publish any obscene imitation or mimicking of religious service. Without further analysis he precipitously concluded, "thus profanity and obscenity were related offenses." The opinion did acknowledge that "[a]t the time of the adoption of the First Amendment, obscenity law was not as fully developed as libel law," but it nevertheless asserted that "there is sufficiently contemporaneous evidence to show that obscenity, too, was outside the protection intended for speech and press." 354 US at 483. The Court went on to label "obscene material" as "material which deals with sex in a manner appealing to prurient interest." *Roth,* 354 US at 487.

The history of obscenity regulations at the time of adoption of the federal constitution was better summarized by Justice Douglas in his dissent in the 1973 case of *United States v. 12 200-Ft. Reels of Film,* 413 US 123, 93 S Ct 2665, 37 L Ed 2d 500, which more closely coincides with our review of the history. Justice Douglas prefaced his dissent by observing

"there is not the slightest evidence that the Framers intended to put the newly created federal regime into the role of

ombudsman over literature. Tying censorship to the movement of literature or films in interstate commerce or into foreign commerce would have been an easy way for a government of delegated powers to impair the liberty of expression. It was to bar such suppression that we have the First Amendment. I dare say Jefferson and Madison would be appalled at what the Court espouses today." 413 US at 132.

He then noted:

"The First Amendment was the product of a robust, not a prudish, age. The four decades prior to its enactment 'saw the publication, virtually without molestation from any authority, of two classics of pornographic literature.' D. Loth, The Erotic in Literature 108 (1961). In addition to William King's The Toast, there was John Cleland's Memoirs of a Woman of Pleasure which has been described as the 'most important work of genuine pornography that has been published in English . . . .' L. Markun, Mrs. Grundy 191 (1930). In England, Harris' List of Covent Garden Ladies, a catalog used by prostitutes to advertise their trade, enjoyed open circulation. N. St. John-Stevas, Obscenity and the Law 25 (1956). Bibliographies of pornographic literature list countless erotic works which were published in this time. See, *e.g.,* A. Craig, Suppressed Books (1963); P. Fraxi, Catena Librorum Tacendorum (1885); W. Gallichan, The Poison of Prudery (1929); D. Loth, *supra;* L. Markun, *supra.* This was the age when Benjamin Franklin wrote his 'Advice to a Young Man on Choosing a Mistress' and 'A Letter to the Royal Academy at Brussels.' 'When the United States became a nation, none of the fathers of the country were any more concerned than Franklin with the question of pornography. John Quincy Adams had a strongly puritanical bent for a man of his literary interests, and even he wrote of Tom Jones that it was "one of the best novels in the language." ' Loth, *supra,* at 120. It was in this milieu that Madison admonished against any 'distinction between the freedom and licentiousness of the press.' S. Padover, The Complete Madison 295 (1953). The Anthony Comstocks, the Thomas Bowdlers and Victorian hypocrisy—the predecessors of our present obscenity laws—had yet to come upon the stage." 413 US at 132-33 (footnote omitted).

The dissent then discussed the early English cases we have cited in this opinion, including *Sir Charles Sydlyes Case,* 83 Eng Rep 1146, 1146-47 (KB 1663), and *Dominus Rex v. Curl,* 93 Eng Rep 849, 851 (KB 1727), concluding:

"The advent of the printing press spurred censorship in

England, but the ribald and the obscene were not, at first, within the scope of that which was officially banned. The censorship of the Star Chamber and the licensing of books under the Tudors and Stuarts was aimed at the blasphemous or heretical, the seditious or treasonous. At that date, the government made no effort to prohibit the dissemination of obscenity. Rather, obscene literature was considered to raise a moral question properly cognizable only by ecclesiastical, and not the common-law, courts. 'A crime that shakes religion (*a*), as profaneness on the stage, &c. is indictable (*b*); but writing an obscene book, as that entitled, "The Fifteen Plagues of a Maidenhead," is not indictable, but punishable only in the Spiritual Court (*c*).' *Queen v. Read,* 88 Eng. Rep. 953 (K. B. 1707). \* \* \*" 413 US at 134-35 (footnote omitted).

Frederick F. Schauer in his extensive work "The Law of Obscenity," The Bureau of National Affairs, Inc. (1976), traces the history of obscenity regulation in England and America. His work parallels that of Justice Douglas and reaches a similar conclusion that early American laws made blasphemy or heresy a crime, but sexual materials not having an antireligious aspect were left generally untouched. We agree that blasphemy and profanity laws restricting expression that is contemptuous toward God cannot be equated with obscenity laws, but to the extent that obscenity laws share these antecedents, they cannot be said to have survived the adoption of the American constitutional guarantees.

From our review of the English and American cases and statutes, we conclude that restrictions on sexually explicit or obscene expressions were not well established at the time the early freedoms of expression were adopted. We disagree with the writers of the *Chaplinsky* and *Roth* opinions that sexually explicit expression was historically unprotected for that reason. The point of our historical review and the historical review relied upon by the United States Supreme Court in *Roth* is that while there may long have been a view that "obscene" materials were improper and not privileged, the pejorative label has not described any single type of impropriety. The term "obscene" simply functioned as a condemnatory term declaring words, pictures, ideas or conduct as improper by definition, whatever may, from time to time, be placed within the definition, *e.g.,* "blasphemous," "profane," "immoral," "depraved," "corrupt," "lewd," "lascivious," "impure" and "hard-core pornography."

We now turn to Oregon history to determine if there is any indication that legislation existing at or near the time of the adoption of Article I, section 8, of the Oregon Constitution demonstrates that "obscene" expressions should be included as an historical exception under the *Robertson* test.

In *Robertson* we said that Article I, section 8,

"forecloses the enactment of any law written in terms directed to the substance of any 'opinion' or any 'subject' of communication, unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted *and that the guarantees then or in 1859 demonstrably were not intended to reach.*" 293 Or at 412 (emphasis added).

We emphasize this last clause because the constitutional guarantee of free speech and press will not be overcome by the mere showing of some legal restraints on one or another form of speech or writing. The party opposing a claim of constitutional privilege must demonstrate that the guarantees of freedom of expression were not intended to replace the earlier restrictions. We were convinced that they were not so intended with regard to common law prosecutions for "perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud." 293 Or at 412. But the state claims that "obscenity" would have been a conventional crime when Oregon's Bill of Rights was adopted in 1857. The state argues that

"in the Oregon Codes of 1853 and 1855, sale, distribution, and possession of obscene writings or pictures was punishable as a misdemeanor by fine and/or imprisonment. Thus, it is apparent that the same type of conduct prescribed under ORS 167.087, i.e., dissemination of obscene writings and/or pictures, constituted a crime at least 5 years prior to adoption of the Oregon Bill of Rights. Therefore, such a crime falls within the historical exception delineated in *Robertson*."

As we cautioned in *State ex rel Oregonian Pub. Co. v. Deiz,* 289 Or 277, 284, 613 P2d 23 (1980), "[c]ontemporaneous legislative actions should not necessarily be given much weight when construing constitutional principles. Constitutional draftsmen are concerned with broad principles of long-

range significance." The only relevant Oregon territorial legislation enacted before Article I, section 8, included prohibitions against the sale, distribution and possession of obscene writings or pictures which manifestly tended to corrupt the morals of youth. Chapter 11, section 10, of the Oregon Code of 1853 ("Steamboat Code"), effective May 1, 1854, and a similar provision of the Oregon Code of 1855, p 234, provided:

> "If any person shall import, print, publish, sell or distribute any book or any pamphlet, ballad, printed paper or other thing containing obscene language or obscene prints, pictures, figures, or other descriptions, *manifestly tending to the corruption of the morals of youth,* or shall introduce into any family, school or place of education, or shall buy, procure, receive, or have in his possession, any such book, pamphlet, ballad, printed paper or other thing, either for the purpose of loan, sale, exhibition or circulation, or with intent to introduce the same into any family, school, or place of education, he shall, on conviction, be punished by imprisonment in the county jail not more than six, nor less than three months, or by a fine not more than three hundred, nor less than fifty dollars." (Emphasis added.)

The territorial statute, which contained no definition of "obscene" and which was directed primarily to the protection of youth, certainly does not constitute any well-established historical exception to freedom of expression and that statute is in no way the equivalent of statutes punishing libel, perjury, forgery and the like.

In 1960, in *State v. Jackson, supra,* a 4-3 decision in which the regular members of this Court divided equally, Justice Rossman, joined by Justices McAllister and Perry and Pro Tem Judge Millard, wrote:

> "Neither party to this appeal argues that obscenity falls within the free speech guarantees of the federal or state constitutions. We think that the authorities marshalled by the majority opinion in *Roth v. United States,* supra, convincingly demonstrate that obscene speech enjoys no such immunity as a matter of history, and we reject an interpretation of our constitution which would protect it in Oregon." 224 Or at 354.[6]

---

[6] The majority opinion in *State v. Jackson,* 224 Or 337, 355, 356 P2d 495 (1960), recognized the impossibility of finding any acceptable definition of the word "obscene"; in fact the court felt that it would have been enough for the state to have alleged that the book was obscene or indecent without more.

We reject that language as historically unsound. Our approach in more recent cases is that stated in Justice O'Connell's dissenting opinion for three members of this court. *See, e.g., State v. Kennedy, supra.* He recognized that in interpreting Article I, section 8, of our Oregon Constitution, the federal *Roth* case was of value only if the reasoning supporting that Court's interpretation of the federal constitution could be used as a guide in construing our own. The dissenting opinion in *Jackson* disagreed with the conclusion in *Roth* that "obscenity is not within the area of constitutionally protected speech or press." Justice O'Connell further commented that it is difficult to see how language or material dealing with love, lust and sex is any less entitled to First Amendment scrutiny when regulation is attempted than is the language or depiction of violence and revolution.[7]

In *Roth* Justice Douglas observed that the First Amendment was a product of a robust, not a prudish age. Likewise, although Oregon's pioneers brought with them a diversity of highly moral as well as irreverent views, we perceive that most members of the Constitutional Convention of 1857 were rugged and robust individuals dedicated to founding a free society unfettered by the governmental imposition of some people's views of morality on the free expression of others. We conclude as we did in reviewing English and American history that restrictions on sexually explicit and obscene expression between adults were not well established at the time of the adoption of Article I, section 8, of the Oregon Constitution. The history of restriction on undefined obscenity contrasts sharply with the Oregon and common law crimes involving expression such as perjury, theft, forgery and fraud that were well established by 1859. The very fact that "obscenity" originally was pursued and repressed for its "anti-establishment" irreverence rather than for its bawdiness elsewhere and only to protect the morals of youth in this state leads us to conclude that no broad or all-encompassing historical exception from the guarantees of free expression was ever intended. The restriction on sexually explicit expression embodied in ORS 167.087 does not satisfy the first part of the *Robertson* test.

---

[7] The Attorney General's Commission on Pornography at 927 reports that a 1985 Newsweek-Gallup Survey disclosed that while only 21 percent of the population would ban materials that show nudity and 47 percent of the population would ban material showing adults having sexual relations, 73 percent of the population would oppose material that shows sexual violence. Apparently the public is more concerned with sexual violence than with the display of sex itself.

We now turn to the issue whether ORS 167.087 censors free speech as guaranteed by the Oregon Constitution. As mentioned, this statute captured the obscenity test set forth by the 1973 Supreme Court of the United States in *Miller v. California, supra.* After *Roth* the Supreme Court in numerous subsequent opinions[8] for 15 years was unable to muster five votes for any theory of censorship of obscenity until *Miller* and *Paris Adult Theatre I v. Slaton,* 413 US 49, 93 S Ct 2628, 37 L Ed 2d 446 (1973). By that time Justice Brennan had come to regret that he ever went for the idea of excluding "obscenity" from the First Amendment in the first place, and he dissented. He concluded that the *Roth/Miller/Paris Adult Theatre* approach is incompatible with a coherent theory of free expression under the First Amendment. We agree with Justice Brennan for the reasons previously expressed and conclude that it is equally incompatible with Article I, section 8, of our state constitution.

*Roth* assumed "obscenity" to be "utterly without redeeming social importance," 354 US at 484-85, but in *Memoirs v. Massachusetts,* 383 US 413, 86 S Ct 975, 16 L Ed 2d 1 (1966), the plurality opinion treated the lack of such "redeeming social importance" not as a reason to exclude obscenity but as part of its definition.

In *Miller v. California, supra,* a five-Justice majority modified the *Roth* test and converted it to (1) whether the "average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. In *Paris Adult Theatre,* a case decided the same day as *Miller,* the Supreme Court rejected the argument that obscene films are constitutionally immune from state regulation simply because they are exhibited to consenting adults only. The Court previously had held, in *Stanley v. Georgia,* 394 US 557, 89 S Ct 1243, 22 L Ed 2d 542 (1969), that mere private possession of obscene matter cannot be proscribed and the constitution protects the right to receive information and ideas and to be generally free from government intrusion into one's privacy. *Miller v. California* continues to represent the federal

---

[8] *See* Schauer, The Law of Obscenity 30-48 (The Emerging Constitutional Standards: From *Roth* to *Miller*) (1976).

standard and the federal courts continue to exclude obscenity as defined in *Miller* from First Amendment protection.

Although the *Miller* test may pass federal constitutional muster and is recommended as a model for state legislatures by the Attorney General's Commission on Pornography, *supra* at 491, the test constitutes censorship forbidden by the Oregon Constitution. As Judge Tanzer aptly noted in *State v. Tidyman,* 30 Or App 537, 547, 568 P2d 666, *rev den* 280 Or 683 (1977), the problem with the United States Supreme Court's approach to obscene expression is that it permits government to decide what constitutes socially acceptable expression, which is precisely what Madison decried: "The difficulty [with the United States Supreme Court's approach] arises from the anomaly that the very purpose of the First Amendment is to protect expression which fails to conform to community standards."

We hold that characterizing expression as "obscenity" under any definition, be it *Roth, Miller* or otherwise, does not deprive it of protection under the Oregon Constitution. Obscene speech, writing or equivalent forms of communication are "speech" nonetheless. We emphasize that the prime reason that "obscene" expression cannot be restricted is that it is speech that does not fall within any historical exception to the plain wording of the Oregon Constitution that "no law shall be passed restraining the expression of [speech] freely on any subject whatsoever."

We do not hold that this form of expression, like others, may not be regulated in the interests of unwilling viewers, captive audiences, minors and beleaguered neighbors. No such issue is before us. But it may not be punished in the interest of a uniform vision on how human sexuality should be regarded or portrayed. We also do not rule out regulation, enforced by criminal prosecution, directed against conduct of producers or participants in the production of sexually explicit material, nor reasonable time, place and manner regulations of the nuisance aspect of such material or laws to protect the unwilling viewer or children. Again, no such issue is before us. However, no law can prohibit or censor the communication itself. In this state any person can write, print, read, say, show or sell anything to a consenting adult even though that expression may be generally or universally considered "obscene."

The Court of Appeals is affirmed, but for the reasons stated in this opinion.