Argued and submitted August 12, 1992; resubmitted In Banc August 8, affirmed December 28, 1994, petition for review allowed April 25, 1995 (321 Or 94) See later issue Oregon Reports

# STATE OF OREGON,
*Appellant,*

*v.*

# MICHAEL R. STONEMAN,
*Respondent.*

## (90-12-5153-C; CA A70085)

888 P2d 39

Janet A. Metcalf, Assistant Attorney General, argued the cause for appellant. With her on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General.

Janet Lee Hoffman argued the cause for respondent. With her on the brief were Margaret Raymond and Hoffman & Matasar.

RICHARDSON, C. J.

Deits, J., dissenting.

Edmonds, J., dissenting.

## RICHARDSON, C. J.

Defendant was charged with paying to obtain a videotape and magazine that depicted sexually explicit conduct by a child under 18 years of age. ORS 163.680.[1] The trial court held that ORS 163.680 violated Article I, section 8, of the Oregon Constitution and sustained defendant's demurrer to the indictment on the basis of *State v. Henry*, 302 Or 510, 732 P2d 9 (1987). The state appeals, ORS 138.060(1), and argues that ORS 163.680 does not violate Article I, section 8, because: (1) the statute focuses on the harmful effects of speech, *i.e.*, the abuse of children in the production of child pornography, and not the content of the expression itself; (2) if, however, the statute is content-based, it embodies a historical exception to Article I, section 8; and (3) laws enacted to protect children should be excepted from the sweep of Article I, section 8, because of their exceptional importance to the state. We affirm.

■■ The first step in analyzing an Article I, section 8, challenge is to determine whether the prohibited activity involves "speech" or "expression" within the meaning of Article I, section 8.[2] *Moser v. Frohnmayer*, 315 Or 372, 375, 845 P2d 1284 (1993). Article I, section 8, provides:

---

[1] The 1987 version of ORS 163.680(1) applies to this case. It provided:

"*It is unlawful for any person* to pay or give anything of value to observe sexually explicit conduct by a child known by the person to be under 18 years of age, or *to pay or give anything of value to obtain or view a photograph, motion picture, videotape or other visual reproduction of sexually explicit conduct by a child under 18 years of age.*" (Emphasis supplied.)

The statute has since been amended by Oregon Laws 1991, chapter 664, section 8. However, the emphasized language in the 1987 statute, which is at issue in this case, has been retained without any material change in ORS 163.680(2).

[2] The analytical framework for determining facial challenges made on the basis of this constitutional provision is not entirely clear. In its decisions, the Supreme Court has consistently relied on and developed the fundamental propositions set out in *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982); however, the progeny of that case do not elaborate consistently exactly how those propositions fit together. *Compare City of Eugene v. Miller*, 318 Or 480, 871 P2d 454 (1994); *Moser v. Frohnmayer*, 315 Or 372, 845 P2d 1284 (1993); *State v. Plowman*, 314 Or 157, 838 P2d 558 (1992), *cert den* ___ US ___ (1993); *State v. Henry*, 302 Or 510, 732 P2d 9 (1987); and *State v. Robertson, supra, with In re Fadeley*, 310 Or 548, 802 P2d 31 (1990); *Oregon State Police Assn. v. State of Oregon*, 308 Or 531, 783 P2d 7 (1989), *cert den* 498 US 810 (1990); *State v. Moyle*, 299 Or 691, 705 P2d 740 (1985); and *State v. Garcias*, 296 Or 688, 679 P2d 1354 (1984). Our analysis here follows the most recent framework that the court has articulated. *See City of Eugene v. Miller, supra, Moser v. Frohnmayer, supra,* and *State v. Plowman, supra.*

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

The depictions of sexually explicit materials described in ORS 163.680(1) are a type of expression comprehended by Article I, section 8. Neither party argues otherwise.

■ ■ The second step in the analysis is to determine whether the law is directed at the "substance of any 'opinion' or any 'subject' of communication," *i.e.*, content, or whether the law is directed at forbidden effects. *State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982); *see also State v. Plowman*, 314 Or 157, 165, 838 P2d 558 (1992), *cert den* ___ US ___ (1993). If a law proscribes expression on the basis of content, then, on its face, it violates Article I, section 8, unless

" 'the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach.' " *State v. Plowman, supra*, 314 Or at 164 (quoting *State v. Robertson, supra*, 293 Or at 412).

The party opposing the claim of constitutional protection has the burden of demonstrating that the restriction on expression falls within a historical exception. *State v. Henry, supra*, 302 Or at 521.

■ A law directed at harmful effects may expressly prohibit expression or the law may not refer to expression at all. If a law prohibits the expression that causes harmful effects, the law

" 'must be scrutinized to determine whether it appears to reach privileged communication or whether it can be interpreted to avoid such "overbreadth." ' " *State v. Plowman, supra*, 314 Or at 164 (quoting *State v. Robertson, supra*, 293 Or at 418).

If the law focuses on the forbidden effects without referring to expression at all, the court can scrutinize the law for vagueness or an unconstitutional application. *State v. Plowman, supra*, 314 Or at 164; *see also City of Eugene v. Miller*, 318 Or 480, 490, 871 P2d 454 (1994).

The state's primary argument is that ORS 163.680 is directed at some identified, harmful effect of child pornography rather than the content of the expression. The state argues that, because ORS 163.680 only proscribes giving value to view visual reproductions of children engaged in sexually explicit conduct, the statute's focus is on the harmful effects that flow from using children to produce pornographic materials.

Two cases help define the difference between laws that focus on harmful effects and laws that focus on the content of expression. In *State v. Plowman, supra*, the Supreme Court held that ORS 166.165(1)(a)(A), the statute creating and defining the crime of intimidation in the first degree, did not violate Article I, section 8. That statute requires proof of four elements:

> "(1) Two or more persons must act together; (2) they must act because of their perception of the victim's race, color, religion, national origin, or sexual orientation; (3) they must cause physical injury to the victim; and (4) they must cause the physical injury intentionally, knowingly, or recklessly." 314 Or at 165.

The defendant argued that the statute punished both opinion and communication. The court rejected that argument. First, it held:

> "Rather than proscribing opinion, that law proscribes a forbidden effect: the effect of acting together to cause physical injury to a victim whom the assailants have targeted because of their perception that that victim belongs to a particular group. The assailants' opinions, if any, are not punishable as such. ORS 166.165(1)(a)(A) proscribes and punishes committing an act, not holding a belief." 314 Or at 165.

Second, the court held that the statute did not impermissibly reach communication. It did not require proof of the communication of the assailants' perception, and, in any case, using speech to prove the crime was distinguishable from making expression or opinion a crime or an element of a crime.

In *City of Portland v. Tidyman*, 306 Or 174, 759 P2d 242 (1988), the court reached the opposite conclusion with regard to an ordinance regulating the location of "adult businesses." There, the city argued that the ordinance was

constitutional because it was aimed at the adverse consequences adult businesses had on nearby residential and commercial areas. In rejecting the city's argument, the court first compared the challenged ordinance with the "coercion" statute at issue in *State v. Robertson, supra.* The court noted that, in *Robertson*, the coercion statute made the undesired effect an element of the statute. But, in *Tidyman*, the court determined that the Portland ordinance did not make harmful effects of adult businesses an element of the ordinance:

> "The Portland ordinance, in contrast [to the coercion statute], undertakes to prevent what the city believes to be the effects of the trade in sexually explicit verbal or pictorial material by describing the content of this communicative material." 306 Or at 184.

Despite the fact that the effects were not part of the ordinance, the city argued that the legislative findings that prefaced the ordinance provided the necessary proof that it focused on the harmful effects of adult businesses. The court, however, held that legislative history was insufficient to meet the constitutional requirement:

> "In short, the problem with the city's asserted 'concern with the effect of speech,' is that the operative text of the ordinance does not specify adverse effects that constitute the 'nuisance' attributable to the sale of 'adult' materials and therefore does not apply only when these adverse effects are shown to occur or imminently threaten to occur. Rather, the ordinance makes a one-time legislative determination that retailing substantial quantities of sexually oriented pictures and words within the proscribed area will have adverse effects that retailing other pictures and words would not have, and that it therefore can be restricted as a 'nuisance' by a law describing the materials rather than the effects. By omitting the supposed adverse effects as an element in the regulatory standard, the ordinance appears to consider the 'nuisance' to be the characteristics of the 'adult' materials rather than secondary characteristics and anticipated effects of the store. Such lawmaking is what Article I, section 8, forbids." 306 Or at 185-86. (Footnote omitted.)

With these two cases in mind, we turn to the statute at issue in this case. *Former* ORS 163.680(1) provided:

> "It is unlawful for any person to pay or give anything of value to observe sexually explicit conduct by a child known by

the person to be under 18 years of age, or to pay or give anything of value to obtain or view a photograph, motion picture, videotape or other visual reproduction of sexually explicit conduct by a child under 18 years of age."

The text of the statute makes it unlawful for a person to give value to view or obtain particular expressive material, *because of* its content — the depiction of sexually explicit conduct by a child. It is unlike the statute in *Plowman*, which proscribed the forbidden effects of opinion, "acting together to cause physical injury to a victim whom the assailants have targeted because of their perception that the victim belongs to a particular group." Nowhere in the text of ORS 163.680(1) has the legislature expressly identified any harmful effects to be prevented by the enforcement of this statute. The language is directed solely at prohibiting persons from paying to obtain or view the sexually explicit materials.

The state argues, and the dissents agree, that we can infer that ORS 163.680 is directed at the abuse and exploitation of children rather than at the sexually explicit material. We do not agree that we can make that inference.

In *Moser v. Frohnmayer, supra*, the court said:

"To be valid as a law that focuses on a harmful effect of speech, the law must 'specify expressly or by clear inference what "serious and imminent" effects it is designed to prevent.' " 315 Or at 379 (quoting *Oregon State Police Assn. v. State of Oregon*, 308 Or 531, 541, 783 P2d 7 (1989) (Linde, J., concurring), *cert den* 498 US 810 (1990)).

In *City of Portland v. Tidyman, supra*, the court refused to use express legislative findings in the preface to the ordinance to infer the targeted effects when the ordinance, on its face, only regulated a particular type of expression. 306 Or at 184-85. *Cf. City of Eugene v. Miller, supra*, 318 Or at 490-91 (challenged ordinance did not, on its face, regulate expression or content; in analyzing this ordinance "as applied," the court looked beyond the face of the ordinance to determine the harmful effects the city intended this ordinance to prevent). The court concluded in *Tidyman* that it is "the operative text of the legislation, not prefatory findings, that people must obey and that administrators and judges enforce." 306 Or at 185.

The state also suggests that the statute focuses on the harmful effects of child abuse, because by depleting the market for such materials, and thus removing the incentive to produce child pornography, the statute will have the effect of lessening child abuse. However, there is nothing in the text of the statute to suggest this inference.

■ We could theorize an array of effects that the statute was intended to eliminate,[3] but such an exercise is pointless in the light of the court's decision in *City of Portland v. Tidyman, supra*. This case provides an even stronger argument for holding that ORS 163.680 violates Article I, section 8, because here not only does the operative text make no mention of preventing harmful effects, but there are not even any legislative findings prefacing the statute. The state offers only broad policy objectives and an economics lesson in supply and demand to support the inference that the statute is intended to proscribe the harmful effects of child abuse. We reject the state's contention that the statute properly focuses on harmful effects rather than on the content of the materials expressly proscribed.

■ The state contends, alternatively, that, even if ORS 163.680 proscribes expression on the basis of content, it is valid because the proscription falls within a historically established exception to Article I, section 8. The state's burden in demonstrating such an exception is a heavy one

> " 'because the constitutional guarantee of free speech and press will not be overcome by the mere showing of some legal restraints on one or another form of speech or writing.' " *Moser v. Frohnmayer, supra*, 315 Or at 376 (quoting *State v. Henry, supra*, 302 Or at 521).

Some examples of historical exceptions to the guarantees of free speech include: "perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud." *State v. Robertson, supra*, 293 Or at 412.

The state makes two arguments to support its contention that a historical exception exists. First, it argues that the complete absence of child pornography, the materials and

---

[3] The dissent contends that the forbidden effect is clearly inferable, because ORS 163.680 is part of a series of statutes designed to protect children. Given the Supreme Court's analysis in *Tidyman* the dissent's contention is not tenable.

conduct prohibited by ORS 163.680, at the time of the adoption of the constitution is indicative of a historic exception. Subsumed in this argument are two separate theories. The first is that the conduct prohibited by the statute is the result of new technologies which did not exist at the time the constitution was adopted. The other theory is that the historical intolerance of pornographic materials depicting children made the enactment of contemporaneous laws unnecessary. Second, the state argues that territorial legislation, which existed at the time the constitution was adopted, can be construed to indicate a historical exception was intended. We do not find either of the state's arguments convincing.

■      The state's first argument that the historical absence of certain types of expression indicates a lack of constitutional protection for that expression, has previously been rejected. *See Moser v. Frohnmayer, supra,* 315 Or at 378; *Ackerley Communications, Inc. v. Mult. Co.,* 72 Or App 617, 624, 696 P2d 1140 (1985), *rev dismissed* 303 Or 165 (1987). In *Moser,* the court also addressed an argument similar to the state's "new technology" theory. In *Moser,* the state argued that because automatic telephone dialing and announcing devices were not invented at the time the constitution was adopted, such new forms of communication made possible by advanced technologies were not speech protected by Article I, section 8. The court rejected this argument holding that new forms of communication are protected by Article I, section 8.

The state's other theory that social intolerance formed a historical exception is based mainly on supposition. The state offers little evidence that society disapproved of pornography depicting children.[4] In response to the state's argument, defendant points out that literature involving the sexual conduct of children was available in the 18th and 19th

---

[4] The state cites two law review articles and the United States Attorney General's Report as support for its argument that child pornography is a new phenomenon. *See* Shouvlin, "Preventing the Sexual Exploitation of Children: A Model Act," 17 Wake Forest L Rev 535 (1981); Comment, "Preying on Playgrounds: The Sexploitation of Children in Pornography and Prostitution," 5 Pepperdine L Rev 809 (1978); *see also* United States Attorney General's Commission on Pornography, Final Report (1986). However, beyond this limited showing, the state offers no evidence that expression depicting children was encompassed by a historical exception from the guarantees of free speech.

centuries. Similarly, the court in *State v. Henry, supra,* spoke of the members of the Constitutional Convention as

"rugged and robust individuals dedicated to founding a free society unfettered by the governmental imposition of some people's views of morality on the free expression of others." 302 Or at 523.

In its discussion of the acceptability of "obscene" materials, the court concluded that "restrictions on sexually explicit and obscene expression between adults were not well established at the time of the adoption of Article I, section 8." This being the case, the court determined that no well-established historical exception from constitutional protection for obscenity was ever intended. We conclude that the little evidence offered by the state fails to establish that there was a complete historical absence of child pornography and is insufficient to support a historical exception.

We turn to the state's second argument that the territorial legislation analyzed in *State v. Henry, supra,* provides the basis on which to find a historic exception. The state distinguishes the court's analysis in *Henry,* that

"[t]he territorial statute, which contained no definition of 'obscene' and which was directed primarily to the protection of youth, certainly does not constitute any well-established historical exception to freedom of expression and that statute is in no way the equivalent of statutes punishing libel, perjury, forgery and the like." 302 Or at 522.

The state points out that the analysis of the territorial statute in *Henry* was in the context of determining the constitutionality of obscene expression between adults, whereas, this case addresses specifically the constitutionality of a statute involving children. The state argues that the specific prohibitions in ORS 163.680 are merely a modern version of the protection encompassed in the territorial statute.

Despite the different context, the territorial provision is no better suited to support a historical exception in this case than it was in *State v. Henry, supra.* The court in *Henry* rejected the argument that the territorial provision created a historical exception: "[T]hat statute is in no way the equivalent of statutes punishing libel, perjury, forgery and the like." 302 Or at 522. Second, as in *Henry,* the territorial provision

stands on its own as far as legal restraints offered to establish a historical restriction. The mere showing of "some" legal restraint is insufficient to prove a well-established exception to freedom of expression.

■ Even if we were to assume that the territorial provision represents a well-established historical exception, we cannot say that the prohibition of ORS 163.680 is "wholly confined" within that exception. *See State v. Robertson, supra*, 293 Or at 412. The territorial provision was directed at persons who "import, print, publish, sell or distribute" things "containing obscene language or obscene prints * * * manifestly tending to the corruption of the morals of youth" or who introduce or intend to introduce such materials into a "family, school, or place of education." *See* Statutes of Oregon 1854, ch XI, § 10, pp 210-11. The provision thus prohibited only the production and intended or actual distribution of the materials, whereas the statute at issue here prohibits the purchase of certain materials. We also note that the territorial provision appears to have been directed solely at protecting youths from *viewing* obscene materials, not from being the subjects of such materials. Further, because the territorial provision does not define "obscene," it is difficult to delineate the boundaries of the historical restriction and, thus, determine whether the challenged statute extends beyond the restriction. As the court in *Henry* said, "[t]he term 'obscene' simply functioned as a condemnatory term declaring words, pictures, ideas or conduct as improper by definition, whatever may, from time to time, be placed within the definition." 302 Or at 520.

Thus, even assuming that the territorial provision created a historical exception, the scope of the exception is too undefined to conclude that ORS 163.680 falls within its confines. In summary, even if we consider the historical absence and the territorial provision arguments together, as indicative of some historical exception, the evidence offered by the state does not amount to a well-established and defined restriction on child pornography equivalent to "libel, perjury, forgery and the like."

The state's final argument suggests that we adopt a position similar to that of the United States Supreme Court and other state appellate courts upholding laws that prohibit

the possession of child pornography. Basically, the state contends that laws, which are designed to protect children and are narrowly construed to do so, should be excepted from the scope of Article I, section 8, because such laws are of exceptional and legitimate importance to the state. It cites, *inter alia, Osborne v. Ohio*, 495 US 103, 110 S Ct 1691, 109 L Ed 2d 98 (1990), and *New York v. Ferber*, 458 US 747, 102 S Ct 3348, 73 L Ed 2d 1113 (1982). For support in Oregon cases, the state quotes Justice Gillette's concurrence in *City of Portland v. Tidyman, supra*, 306 Or at 192 ("The right of * * * the state to enact legislation to protect the welfare of children approaches the plenary."), and the majority in *In re Fadeley*, 310 Or 548, 559, 802 P2d 31 (1990) ("Not even Article I, section 8, is absolute—there are exceptions to its sweep. Among the exceptions are certain rules of professional conduct, * * * as well as certain historical exceptions.").

■　Essentially, the state asks us to treat expression involving sexual conduct by children differently than other types of expression. The problem with the state's argument is that the Oregon Supreme Court has developed a unique analysis that treats different types of speech equally under Article I, section 8. For example, unlike under federal First Amendment analysis, Article I, section 8, analysis does not differentiate commercial expression and obscene expression from other kinds of speech. *See Moser v. Frohnmayer, supra; State v. Henry, supra*. Additionally, Oregon courts have not adopted the federal First Amendment analysis which balances governmental interests in scrutinizing restrictions on free speech.[5] *See Deras v. Myers*, 272 Or 47, 64, 535 P2d 541 (1975) (the federal constitution is "not controlling where this court is of the opinion that our constitution should provide a larger measure of protection to the citizen")(footnote omitted).

■　■　The state may regulate "obscene" material in the interest of children, *State v. Henry, supra*, 302 Or at 525, but

---

[5] *See, e.g., Consolidated Edison Co. v. Public Serv. Comm'n*, 447 US 530, 540, 100 S Ct 2326, 65 L Ed 2d 319 (1980) (content based restrictions require a showing by the government "that the regulation is a precisely drawn means of serving a compelling state interest"); *see also Renton v. Playtime Theatres, Inc.*, 475 US 41, 50, 106 S Ct 925, 89 L Ed 2d 29 (1986) (appropriate inquiry for content neutral restrictions is "whether the * * * ordinance is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication").

that regulation must fall within the parameters of the harmful effects analysis. *See City of Portland v. Tidyman, supra,* 306 Or at 191. Whatever the extent of the state's power to protect children, it must be exercised legislatively, and when the protection implicates constitutionally protected expression, it must be exercised explicitly and precisely.

Affirmed.

**DEITS, J.,** dissenting.

I agree with the majority that ORS 163.680 is not a modern version of a well-established and demonstrably preserved historical exception to Article I, section 8. I also agree that we may not carve out a special exception from Article I, section 8, for expression involving sexual conduct by children. I disagree, however, with the majority's conclusion that the statute is unconstitutional on its face because it focuses on the substance of the expression. I believe that the statute is a permissible prohibition of the harmful effects that flow from giving value to view children involved in sexually explicit conduct.

As the Supreme Court has stated:

"[A]rticle I, section 8, prohibits lawmakers from enacting restrictions that focus on the content of speech or writing, either because that content itself is deemed socially undesirable or offensive, or because it is thought to have adverse consequences. * * * [L]aws must focus on proscribing the pursuit or accomplishment of forbidden results rather than on the suppression of speech or writing either as an end in itself or as a means to some other legislative end." *State v. Robertson,* 293 Or 402, 416, 649 P2d 569 (1982).

For a law to be valid on the ground that it focuses on the harmful effects of speech, it must " 'specify expressly or by clear inference what "serious and imminent" effects it is designed to prevent.' " *Moser v. Frohnmayer,* 315 Or 372, 379, 845 P2d 1284 (1993) (quoting *Oregon State Police Assn. v. State of Oregon,* 308 Or 531, 541, 783 P2d 7 (1989) (Linde, J., concurring)), *cert den* 498 US 810 (1990). If the law expressly prohibits expression used to achieve those proscribed effects, the law

" 'must be scrutinized to determine whether it appears to reach privileged communication or whether it can be interpreted to avoid such "overbreadth." ' " *State v. Plowman,* 314 Or 157, 164, 838 P2d 558 (1992) (quoting *State v. Robertson, supra,* 293 Or at 418).

A statute that expressly prohibits expression used to achieve proscribed effects is constitutional unless it is incurably overbroad. *State v. Robertson, supra,* 293 Or at 417-18.

ORS 163.680 is not directed at the "substance of any 'opinion' or [any] 'subject' of communication." *State v. Robertson, supra,* 293 Or at 412. As the state explains, the statute does not prohibit communication of the idea of sexually explicit conduct by children, such as by written descriptions or depictions, verbal descriptions, animated films or even live films using 18-year-olds who appear to be younger. Rather, the statute is directed against causing a harm that may be forbidden: the abuse and exploitation of real children.[1] Although the majority is correct that the statute does not explicitly include this effect as an element of the crime, I do not believe that its failure to do so is fatal.

The majority relies heavily on *City of Portland v. Tidyman,* 306 Or 174, 759 P2d 242 (1988), to support its conclusion that, absent an express statutory recitation of specific targeted effects, the statute cannot be read as focusing on the prevention of those effects. I believe that reliance is misplaced. In *Tidyman,* the city argued that the legislative findings prefacing the ordinance, which restricted the location of adult bookstores, identified the harmful effects that were the focus of the ordinance. The court held that the city's "harmful effects" argument failed because "the operative text of the ordinance *does not specify* adverse effects that constitute the 'nuisance' attributable to the sale of 'adult' materials."[2] 306 Or at 185. (Emphasis supplied.) It further

---

[1] Defendant argues that the statute is not by its terms limited to materials that depict real children and, thus, "extends to paintings, drawings or renderings from imagination rather than life." I disagree. "Child," as used in the statute, is defined as "a *person* who is less than 18 years of age." ORS 163.665(1). (Emphasis supplied.)

[2] In a similar vein, the court also noted:

"It is not a technical detail of drafting that such a restriction [on free expression] must specify the proscribed harm and not only the expression that is thought to threaten the harm." *City of Portland v. Tidyman, supra,* 306 Or at 189.

held that a one-time legislative determination, that certain undesirable effects will flow only from the marketing of adult materials within the proscribed area, could not justify a restriction of such marketing by an ordinance that described the materials instead of the effects. 306 Or at 185-86.

Subsequent to *Tidyman*, however, the Supreme Court recognized that a statute focusing on the harmful effects of speech need not always *explicitly* identify the proscribed harm along with the expression that is thought to threaten the harm. In *Moser v. Frohnmayer, supra*, the court made it clear that a law that focuses on the harmful effects of speech is valid if it "specif[ies] expressly *or by clear inference*" the effects it is designed to prevent. 315 Or at 379 (emphasis supplied); *see also Moser v. Frohnmayer, supra*, 315 Or at 384 (Graber, J., concurring in part and specially concurring in part) (laws of this kind must "expressly or by clear implication" identify the harm sought to be eliminated). In *State v. Miller*, 318 Or 480, 489-90, 817 P2d 454 (1994), its most recent opinion dealing with this issue, the court concluded that the sidewalk vending ordinances at issue there were directed at proscribing forbidden effects, not at suppressing speech. It reached that conclusion, however, by considering the results that the city *argued* it was prohibiting and the goals that the city *claimed* it was seeking to accomplish. 318 Or at 483, 489. The court thus looked beyond the actual text of those ordinances, which included, at most, only one of those forbidden results and none of the professed goals.

More importantly for the statute at issue here, a clear statutory reference to the targeted effects of expression may be of less import when the statute is designed to protect children. In *Tidyman*, the court held that the ordinance restricting the location of adult bookstores was unconstitutional because it did not specify the "supposed" harmful effects that it was allegedly designed to address. 306 Or at 186. In a separate opinion, Justice Gillette agreed with the majority that an ordinance aimed by its terms at protected activity must have a statement of the effects sought to be limited or eliminated. 306 Or at 192 (Gillette, J., concurring in part and specially concurring in part). However, he viewed the portion of the ordinance that restricted adult businesses near schools to be a regulation designed to protect children

and, therefore, believed that it stood on a different footing than the rest of the ordinance. According to Justice Gillette,

"[t]he right of the city, a county or the state to enact legislation to protect the welfare of children approaches the plenary. If this ordinance dealt with that subject only, it might well pass constitutional muster."[3] 306 Or at 192.

I do not read that language to mean that the state may infringe on an individual's constitutional rights whenever its motive is to protect children. However, I believe that it does mean that when the protection of children is clearly the purpose of a regulation, the harmful effects sought to be eliminated may be inferred.

In my view, before we can summarily dispose of a statute that is aimed at secondary effects of expression, but does not identify those effects as elements of the crime, we must first inquire as to the purpose of the statute. The statute at issue here, ORS 163.680, is part of a series of criminal statutes dealing with visual recordings of sexual conduct involving children. ORS 163.665 to ORS 163.695. The foundation of those statutes is ORS 163.670, which prohibits using a child less than 18 years of age in a display of sexually explicit conduct for purposes of observation or recordation.[4] Without question, that statute is designed to protect the welfare of children. So, too, then, are the statutes that are based upon it, including ORS 163.680.

In view of the fact that ORS 163.680 is designed to protect children, I believe that the statute properly focuses on preventing a clearly inferable harmful effect of expression, in accordance with the standard articulated in *Moser* and the analysis of Justice Gillette. Further, unlike the ordinance at issue in *Tidyman*, ORS 163.680 is not "using apprehension of unproven effects as a cover for suppression of undesired expression." 306 Or at 188. The abuse and exploitation of

---

[3] Because the city did not request that the provisions relating to schools be treated as severable, Justice Gillette agreed that the entire ordinance should be declared unconstitutional. *City of Portland v. Tidyman, supra,* 306 Or at 192.

[4] We have previously held that the behavior proscribed in ORS 163.670 is not expressive or communicative in nature and, therefore, does not fall within the protective parameters of Article I, section 8. *State v. Meyer,* 120 Or App 319, 328 n 13, 852 P2d 879 (1993).

children is far from speculative; it necessarily and unavoidably accompanies the creation and proliferation of child pornography. In my view, that is the type of harmful effect envisioned by the Supreme Court when it held that a statute focusing on secondary effects of expression may pass constitutional muster if the proscribed harm is made part of the statute "by clear inference."

In summary, I believe that the statute's failure to specify expressly the serious and imminent harms that it seeks to ameliorate is not fatal, and that the majority's strict adherence to the language of *Tidyman* to hold otherwise is unwarranted. Moreover, in contrast to the "supposed" adverse effects that may flow from the operation of an adult bookstore, the harms sought to be prevented here will *always* exist when value is given to view children involved in sexually explicit conduct;[5] thus, the statute is not overbroad. For all of the above reasons, I respectfully dissent.

Rossman and De Muniz, JJ., join in this dissent.

**EDMONDS, J.,** dissenting.

I concur with the dissent of Deits, J., that ORS 163.680 is a constitutionally permissible prohibition of the harmful effects that arise from the dissemination of child pornography. However, in contrast to that dissent's position, I believe that ORS 163.680(1) (*renumbered* ORS 163.680(2) in 1991; *amended by* Or Laws 1991, ch 664, § 8) also is a modern version of a well-established and demonstrably preserved historical exception to Article I, section 8. I add the following comments in support of Judge Deits's opinion that the statute focuses on harmful effects, rather than on the content of expression.

The proper analysis begins with the language of the statute. ORS 163.680(1) makes it

"unlawful for any person to pay or give anything of value to obtain or view a photograph, motion picture, videotape or other visual reproduction of sexually explicit conduct by a child under 18 years of age."

---

[5] The legislature created limited statutory defenses to ORS 163.680 for bona fide law enforcement activities and bona fide educational activities. *Former* ORS 163.685.

"Sexually explicit conduct," as used in ORS 163.680(1), means:

"[A]ctual or simulated:

"(a)   Sexual intercourse or deviant sexual intercourse;

"(b)   Genital-genital, oral-genital, anal-genital or oral-anal contact, whether between persons of the same or opposite sex or between humans and animals;

"(c)   Penetration of the vagina or rectum by any object;

"(d)   Masturbation;

"(e)   Sadistic or masochistic abuse; or

"(f)   Lewd exhibition of the genitals or anus." ORS 163.665 (*amended by* Or Laws 1991, ch 664, § 4).

The majority says about the statute:

"*The state also suggests* that the statute focuses on the harmful effects of child abuse, because by depleting the market for such materials, and thus removing the incentive to produce child pornography, *the statute will have the effect of lessening child abuse. However, there is nothing in the text of the statute to suggest this inference.*" 132 Or App at 144. (Emphasis supplied.)

The majority's assertion is myopic. In the Final Report of the United States Attorney General's Commission on Pornography,[1] the commission discussed the visual recording of sexual conduct by children:

"Thus, the necessary focus of an inquiry into child pornography must be on the process by which children, from as young as one week up to the age of majority, are induced to engage in sexual activity of one sort or another, and the process by which children are photographed while engaging in that activity. The inevitably permanent record of that sexual activity created by a photograph is rather plainly a harm to the children photographed. But even if the photograph were never again seen, the very activity involved in creating the photograph is itself an act of sexual exploitation

---

[1] Former United States Attorney General Edwin Meese formed the Commission on Pornography in 1985. He asked it to "determine the nature, extent, and impact on society of pornography in the United States, and to make specific recommendations to the Attorney General concerning more effective ways in which the spread of pornography could be contained with constitutional guarantees." Commission Charter, *reprinted in* United States Department of Justice, Attorney General's Commission on Pornography, Final Report 1957 (July 1986).

of children, and thus the issues related to the sexual abuse of children and those related to child pornography are inextricably linked. Child pornography necessarily includes the sexual abuse of a real child, and there can be no understanding of the special problem of child pornography until there is understanding of the special way in which child pornography *is* child abuse." United States Department of Justice Attorney General's Commission on Pornography, Final Report 405-06 (July 1986). (Footnote omitted; emphasis in original.)

Unlike obscenity laws, which focus on the value of the expression in question, ORS 163.280(1) is concerned with protecting children by forbidding the use for pecuniary benefit of visual recordings that depict the sexual abuse of children. The vivid word pictures painted by the language of ORS 163.680(1) are graphic illustrations of the exploitation of children. The genesis of the dissemination of any expressive material referred to in ORS 163.680(1) necessarily involves the depiction of actual child abuse or simulated child abuse by children. To meet the definition of the statute, the material must record actual or simulated sexual intercourse, deviant sexual intercourse, genital contact between persons of the same or opposite sex or between humans and animals, or other related conduct by *children*. The very nature of those acts means that the child participants are being sexually abused by those who procure their performances.

An analogy to the harm at which ORS 163.680(1) is aimed can be drawn to the propagation of a video recording that records an actual rape or murder, when the crime is committed for the purposes of recordation and distribution for pecuniary benefit. Without hesitation, we would hold that any prohibition of such conduct focuses on the crime that is being committed, not on the means of expression that records the conduct. The focus of ORS 163.680(1) is further defined by what it does not proscribe. For instance, the statute does not make unlawful all kinds of child pornography. It permits the dissemination of drawings, written descriptions or computer portrayals of sexually explicit conduct by children. Such depictions do not directly implicate the welfare of real children as does ORS 163.680(1), which is aimed at protecting children from being used in actual or simulated live sex acts. Judge Deits's assertion that it is clear from the language of

the statute that the prohibitions of ORS 163.280(1) are intended to prevent harmful effects on children is correct.

The majority also holds that ORS 163.680(1) does not constitute a historical exception to Article I, section 8. When considering this issue, it is important to be mindful of the distinction between obscenity in general and pornography depicting children engaged in live and simulated sex acts. In *State v. Henry*, 302 Or 510, 732 P2d 9 (1987), the Supreme Court held that, in general, obscene expression does not fall into any historical exception to section 8. However, it cautioned:

> "We also do not rule out regulation, enforced by criminal prosecution, directed against conduct of producers or participants in the production of sexually explicit material, nor reasonable time, place and manner regulations of the nuisance aspect of such material or laws to protect the unwilling viewer or children. Again, no such issue is before us." 302 Or at 525.

Because the kind of child pornography addressed by ORS 163.680(1) involves the sexual exploitation and abuse of children, it does not necessarily follow from the fact that obscenity in general is protected expression under section 8 that the constitutional drafters also considered child pornography of that kind to be protected expression. In *Henry*, the court said that "restrictions on sexually explicit and obscene expression *between adults* were not well established at the time of the adoption of Article I, section 8 * * *." 302 Or at 523. (Emphasis supplied.) In contrast, the pioneers who came to Oregon *were* concerned about expressive material that impacted the behavior of minors. Before statehood, the Oregon territorial legislature made it an offense to "import, print, publish, *sell or distribute* any book or any pamphlet, ballad, printed paper or other thing containing obscene language or obscene prints, pictures, figures, or other descriptions, *manifestly tending to the corruption of the morals of youth* * * *." Statutes of Oregon 1854, Crimes and Punishments, ch XI, § 10, pp 210-11. (Emphasis supplied.) It appears that the territorial legislature borrowed its statute almost word for word from an 1835 Massachusetts statute. Three years later, Article I, section 8, was adopted as part of Oregon's original constitution.

The distinction between how child pornography depicting live or simulated sex acts and obscenity in general would have been viewed by the drafters of section 8 may best be understood by reviewing the history of government regulation of obscenity and then comparing that regulation to the historic regulation of expression impacting the health and morals of children.

"The development of modern obscenity law as it is recognized in the United States began in England. The court of Star Chamber reviewed books and theater during the reign of King Henry VIII and continued until 1640. Restrictions placed on materials were still based largely on religious and political grounds. The focus began to change in 1663 when the British courts were confronted with the situation which arose as the case *King v. Sedley*. This case is widely regarded as the first reported obscenity case. Sir Charles Sedley, in an intoxicated state, stood on a tavern balcony, removed his clothes, and delivered a series of profane remarks. At the conclusion of his tirade, he poured bottles filled with urine on the crowd below. Sedley was convicted, fined, and incarcerated for a week. Sedley's case was thus the first involving an offense to public decency as opposed to one against religion or government. One hundred and fifty years later, it would also be relied on as precedent by the first American court to find obscenity indictable at common law.

"Public concern over obscenity increased in 17th century England, and in 1708 James Read was indicted for publishing the book *The Fifteen Plagues of a Maidenhead*. The Queens Bench Court dismissed the indictment against Read for obscene libel in *Queen v. Read*. The court found that Read's work was not a reflection on the government, the church, or any individual, and it rejected the idea that libel included obscenity. Another case of obscene libel arose in 1727 when Edmund [Curl] was convicted for publishing *Venus in the Cloister or the Nun in Her Smock*. In [*Rex v. Curl*, 93 Eng Rep 487 (1727)], the court rejected the doctrine of *Read* and relied instead on *Sedley's Case*. The court found corruption of morals to be an offense at common law and thereby established obscenity as a crime.

"The crime of obscene libel took root in 19th century England, and was accompanied by the rise of the Society for the Suppression of Vice in 1802. The Society crusaded against obscene publications, and their work culminated in the passage of two important pieces of legislation. The

Vagrancy Act of 1824 made publication of indecent pictures a forbidden act and Lord Campbell's Act of 1857 gave magistrates authority to issue search warrants for obscene material and have it destroyed. Since the printing of photographs was not prevalent until the late 1800s, the challenged works consisted mainly of writings, sketches, or line drawings.

"* * * * *

"American laws concerning pornography also found their origin in sacrilegious works. In 1711, the colony of Massachusetts enacted a statute stating that 'evil communication, wicked, profane, impure, filthy, and obscene songs, composures, writings, or prints do corrupt the mind and are incentives to all manner of impieties and debaucheries, more especially when digested, composed or uttered in imitation or in mimicking of preaching or any other part of divine worship.' The law prohibited the 'composing, writing, printing or publishing of any filthy, obscene or profane story, pamphlets, libel or mock sermon, in imitation of preaching or any other part of divine worship.' Despite this enactment, there were no reported obscenity prosecutions until 1815 and the Pennsylvania case of *Commonwealth v. Sharpless*[, 2 Serg & Rawle 91 (Pa 1815)]. Sharpless was charged with showing a drawing depicting a man and woman in a lewd posture. Like his British counterparts in *Read* and [*Curl*], Sharpless contended that there was no statute prohibiting his conduct. The Pennsylvania court relied on *Sedley's Case* and found crimes against public decency to be indictable at common law. The first case involving a book alleged to be obscene arose in Massachusetts six years later. Peter Holmes was charged with publishing a lewd illustration along with the book *Memories of a Woman of Pleasure*. Relying on both the common law offense and the Massachusetts statute, the Supreme Judicial Court of Massachusetts convicted Holmes. While the American courts now recognized the common law crime of obscenity, much of the activity which followed was found in the legislative arena. In 1821, Vermont passed the first obscenity statute in the United States. The statute prohibited the printing, publishing, or vending of any lewd or obscene book, picture, or print. Massachusetts enlarged its colonial statute and other states soon followed.

"The first federal law concerning obscene materials was enacted in 1842. The focus of the act was to regulate materials imported into the United States. It prohibited 'all indecent and obscene prints, paintings, lithographs, engravings and transparencies.' " United States Department of

Justice, Attorney General's Commission on Pornography, Final Report, 1240-45 (July 1986). (Footnotes omitted.)

In a parallel sense, governmental concern about the effect of some kinds of expression on children appears to have existed as early as the English case of *Rex v. Hill*, Mich 10 W 3 (1699), where "the defendant was indicted for printing some obscene poems of my Lord Rochester's tending to the corruption of youth * * *." *See Rex v. Curl, supra*, 93 Eng Rep at 850. In this country, some early antiobscenity laws also focused on youthful exposure to particular expression. In *Commonwealth v. Sharpless, supra*, the defendants were indicted for exhibiting a painting "representing a man in obscene, impudent and indecent posture with a woman, to the manifest corruption and subversion of youth, and other citizens of this commonwealth * * *." 2 Serg & Rawle at 91. The indictment in that case alleged that the defendants had committed an offense for

> "being evil-disposed persons, and designing, contriving and intending *the morals*, as well *of youth* as of divers [*sic*] other citizens of this commonwealth, to debauch and corrupt, and to raise and create in their minds inordinate and lustful desires * * *." 2 Serg & Rawle at 91. (Emphasis supplied.)

In finding a common law offense for obscenity, the Pennsylvania court concluded that

> "[t]he corruption of the public mind, in general, and *debauching the manners of youth, in particular*, by lewd and obscene pictures exhibited to view, must necessarily be attended with the most injurious consequences * * *." 2 Serg & Rawle at 103. (Emphasis supplied.)

As the report of the Attorney General's Commission on Pornography points out, Massachusetts recognized a common law offense of obscenity in 1821. The case arose out of the indictment against the publisher of John Cleland's *Memoirs of a Woman of Pleasure* for the publishing of the book and of a "lewd and obscene print, contained in [the book] * * *." *Commonwealth v. Holmes*, 17 Mass 336 (1821). The language of the indictment in that case is instructive regarding the effect of obscene expression on minors. It accused the publisher of

> " 'being a scandalous and evil-disposed person, and contriving, devising and intending *the morals as well of youth* as of

other good citizens of said commonwealth to debauch and corrupt, and to raise and create in their minds inordinate and lustful desires * * *.' " 17 Mass at 336. (Emphasis supplied.)

In both *Sharpless* and *Holmes*, the focus of the allegations arose, in part, from a concern for the welfare of youth and their exposure to erotic material.

Apart from the common law, early statutes also emphasized the problem of exposure of children to obscenity. In 1800, New Jersey enacted an antiobscenity law the purpose of which was to protect children. New Jersey's Act for Suppressing Vice and Immorality, included "concerns about the corruption of the morals of youth, * * * gratifying 'useless curiosity,' and generally serving 'no good or useful purpose in society.' " 1800 N J Rev Laws 329, 331. *See* Saunders, "Media Violence and the Obscenity Exception to the First Amendment," 3 Wm & Mary Bill Rts J 107, 123 (1994). Also, in 1835, Massachusetts enacted the statute after which the Oregon territorial statute was patterned in 1854. The Massachusetts' statute was listed in the Massachusetts code under a chapter titled, "Of Offenses Against Chastity, Morality, & Decency," and prohibited the sale, distribution or publication of

"any book, or any pamphlet, ballad, printed paper, or other thing, containing obscene language, or obscene prints, pictures, figures, or descriptions, manifestly *tending to the corruption of the morals of youth*." 1836 Mass Rev Stat 740. *See* Saunders, "Media Violence," *supra*, 3 Wm & Mary Bill Rts J at 123-24. (Emphasis supplied.)

The concern about the corruption of the morals of youth resulting from exposure to obscenity, as expressed in the territorial statute, remained intact after statehood, and after Article I, section 8, was adopted. The territorial law was included in the first state criminal code written in Oregon in 1864. General Laws of Oregon, ch 48, § 637, p 560 (Crim Code) (Deady 1845-1864). The legislator, writer and compiler of the 1864 Criminal Code which included the statute, was Matthew P. Deady. Deady was not only a drafter of the Oregon Constitution, but was also the President of the Constitutional Convention, and took an active part in the debates regarding the Bill of Rights. *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* 65, 309 (Charles Henry Carey ed 1926). Presumably,

the statute would not have been included in the state's laws after statehood, had the constitutional framers believed that Article I, section 8, permitted the dissemination of expression that corrupted the morals of youth. Later, the statute would merge into general obscenity laws. *See* Or Laws 1885, § 653; *see also* Or Laws 1903, § 1.

In *State v. Henry, supra*, the Supreme Court recognized that

"[t]he territorial statute, which contained no definitions of 'obscene' *and which* was *directed primarily to the protection of youths*, certainly does not constitute any well-established historical exception to freedom of expression * * *." 302 Or at 522. (Emphasis supplied.)

Thus, although prohibitions against general obscenity were not well established, it is clear from the historical precedents that the founding fathers of statehood were concerned about the effect of obscene expression on minors and enacted statutes aimed at that evil. Other statutes that protected female children of a particular age from sexual contact further illustrate the recognition by early lawmakers that government needed to protect young people from adult predators who exploited them. *See, e.g.,* Statutes of Oregon 1854, Crimes and Punishments, ch III, § 18, p 188. It reasonably follows that the drafters of Article I, section 8, would have considered the visual recordation of live or simulated sex acts by children not to be protected expression under section 8. In the light of this history, I am persuaded that ORS 163.680(2) is a descendent of those early laws and reflects a modern historical exception to section 8. However, the majority says:

"Thus, even assuming that the territorial provision created a historical exception, the scope of the exception is too undefined to conclude that ORS 163.680 falls within its confines. In summary, even if we consider the historical absence and the territorial provision arguments together, as indicative of some historical exception, the evidence offered by the state does not amount to a well-established and defined restriction on child pornography equivalent to 'libel, perjury, forgery and the like.' " 132 Or App at 147.

That assertion ignores the language of the territorial and early state laws which made it unlawful to "sell or distribute any book * * * manifestly tending to the corruption

of the morals of youth." Statutes of Oregon 1854, Crimes & Punishments, ch XI, § 10, pp 210-11. The language of ORS 163.680, making it unlawful "for any person to pay or give anything of value to obtain or view" a visual depiction of sexually explicit conduct involving a child expresses an identical policy. If the early state and territorial legislatures considered expression that corrupted the morals of youth not to be protected speech, surely, they would not have intended expression that records live or simulated sex acts by children to be protected. It can hardly be said that involving children in sexually explicit conduct as defined by ORS 163.665 is not conduct that tends to "corrupt the morals of youth."

Also, in considering whether section 8 prohibits statutes such as ORS 163.680(1), it is instructive to consider what the First Amendment proscribes, just as the Supreme Court did in *State v. Henry, supra*, even though section 8 provides broader protection. After all, the drafters of section 8 certainly would have had the First Amendment in mind when they considered the scope of section 8. In *New York v. Ferber*, 487 US 474, 102 S Ct 3348, 73 L Ed 2d 1113 (1982), the United States Supreme Court held that expression about children engaged in live sex acts is not protected under the First Amendment. It said:

"Recognizing and classifying child pornography as a category of material outside the protection of the First Amendment is not incompatible with our earlier decisions. 'The question whether speech is, or is not, protected by the First Amendment often depends on the content of the speech.' * * * Thus, it is not rare that a content-based classification of speech has been accepted because it may be appropriately generalized that within the confines of the given classification, the evil to be restricted so overwhelmingly outweighs the expressive interests, if any, at stake, that no process of case-by-case adjudication is required. When a definable class of material, such as that covered by [New York's Child Pornography Statute], bears so heavily and pervasively on the welfare of children engaged in its production, we think the balance of competing interests is clearly struck and that it is permissible to consider these materials as without the protection of the First Amendment." 487 US at 763-64. (Citations omitted.)

In support of its holding, the Court also said:

"The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance. The legislative findings accompanying passage of the New York laws reflect this concern:

" '[T]here has been a proliferation of exploitation of children as subjects in sexual performances. The care of children is a sacred trust and should not be abused by those who seek to profit through a commercial network based upon the exploitation of children. The public policy of the state demands the protection of children from exploitation through sexual performances.' 1977 NY, Laws, ch 910, § 1.

"We shall not second-guess this legislative judgment. Respondent has not intimated that we do so. Suffice it to say that virtually all of the States and the United States have passed legislation proscribing the production of or otherwise combatting 'child pornography.' The legislative judgment, as well as the judgment found in the relevant literature, is that the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child. That judgment, we think, easily passes muster under the First Amendment." 487 US at 757-58. (Footnotes omitted.)

In summary, ORS 163.680(1) protects children from being sexually abused and exploited. The fact that the statute also inhibits the commercial propagation of visual recordings of the abuse does not make it unconstitutional under Article I, section 8. The sexual abuse of children is not protected expression under section 8, nor can a form of expression that is a mirror of that conduct be privileged because of the historical exception to Article I, section 8, regarding prohibition of the distribution of materials tending to corrupt the morals of youth. Moreover, the holding of the majority not only declares ORS 163.680(1) unconstitutional, but impugns the constitutionality of every Oregon statute dealing with child pornography.[2] In effect, the majority opinion legalizes child pornography in Oregon and its holding will result in a legal cottage industry[3] of child pornography in Oregon. I

---

[2] The definition of "sexually explicit conduct" as used in ORS 163.665 is employed throughout the prohibitions in ORS 163.370 through ORS 163.695. All of those statutes involve depiction of children involved in "sexually explicit conduct."

[3] Los Angeles police estimate that one child pornographer earned $5 million to $7 million before his conviction for molesting a foster child. *Note*, "Child Pornography: A New Role for the Obscenity Doctrine," 1978 UL Law Forum 711, 714.

recognize that the majority sincerely believes in the intellectual integrity of its analysis, and that it is not a willing advocate for the results that its holding will produce. Nonetheless, it is unfortunate that it is unwilling to recognize that the focus of ORS 163.680(1) is not on the value of the expression in question, but on the protection of children who cannot protect themselves. How ironic that Article I, section 8, a wonderful expression of the inherent right of Oregon citizens to freely express themselves in the governing of their own affairs, has now become the beast that swallows the future of our children by perpetuating sexual abuse.

I dissent.

Rossman, J., joins in this dissenting opinion.