920 P.2d 535 (1996)
323 Or. 536
STATE of Oregon, Petitioner on Review,
v.
Michael R. STONEMAN, Respondent on Review.
CC 90-12-5153-C; CA A70085; SC S42085.
Supreme Court of Oregon.
Argued and Submitted November 9, 1995.
Decided July 18, 1996.
*537 Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for petitioner on review. With her on the briefs were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.
Lawrence Matasar, of Hoffman & Matasar, Portland, argued the cause for respondent on review. With him on the brief was Janet L. Hoffman.
Leslie M. Roberts, Portland, and David Schuman, Eugene, filed a brief for amicus curiae American Civil Liberties Union of Oregon.
Kelly Clark, Wilsonville, filed a brief for amicus curiae The Oregon Women's Leadership Task Force.
Janet M. LaRue, Santa Ana, California, in association with Jay R. Jackson, Salem, filed a brief for amicus curiae The National Law Center for Children and Families.
Before CARSON, C.J., and GILLETTE, VAN HOOMISSEN, FADELEY, GRABER, and DURHAM, JJ.[*]
GILLETTE, Justice.
In 1985, the legislature enacted a criminal statute directed at the producers, purveyors, and purchasers of visual reproductions of children engaged in sexually explicit conduct. In 1990, defendant was charged with violating one section of that statute, codified at ORS 163.680 (1987), by purchasing a magazine and a video that allegedly contained portrayals of the proscribed type. At that time, ORS 163.680 provided:
"(1) It is unlawful for any person to pay or give anything of value to observe sexually explicit conduct by a child known by the person to be under 18 years of age, or to pay or give anything of value to obtain or view a photograph, motion picture, videotape or other visual reproduction of sexually explicit conduct by a child under 18 years of age.
"(2) Violation of subsection (1) of this section is a Class C felony."[1]
Defendant demurred, arguing that ORS 163.680 (1987) violated Article I, section 8, of the Oregon Constitution.[2] The trial court sustained defendant's demurrer, and a divided Court of Appeals, sitting in banc, affirmed that ruling. State v. Stoneman, 132 Or.App. 137, 888 P.2d 39 (1994).
We allowed the state's petition for review in order to address the constitutional question posed by this statute. For the reasons that follow, we conclude that ORS 163.680 (1987) did not violate Article I, section 8. We therefore reverse the decision of the Court of Appeals.
It is important at the outset to note that the portion of ORS 163.680 (1987) involved in this case criminalized only the purchase of a very limited and specific kind of material, i.e., the statute dealt exclusively with commerce in visual reproductionsmaterials that employ photographic or videographic methods to reproduce an event.[3] *538 The statute's reach further was confined by the requirement that those visual reproductions depict actual children engaged in "sexually explicit conduct."[4] Thus, materials that merely offer the illusion that actual children are involved (as, for instance, when the subjects are over the age of 18 but appear to be younger) were not included within the statute. Moreover, the child's participation in the act must be real, i.e., the sexual act may be "simulated," but the child's participation in that act cannot be.[5]
A necessary consequence of those legislative limitations is that the photographs and films described in ORS 163.680(1) (1987) can be produced only if someone photographs, films, engages in, or solicits sexual conduct by childrenindividuals unable by virtue of their age to give their informed consent to such activity. And, because such activities, by their very nature, are abusive to children, it follows that a violation of ORS 163.680(1) (1987) necessarily involves the purchase of material that is directly and inextricably connected with sexual abuse of children.
Ultimately, it is that fact that frames the central legal question posed by this case: Did the focus of ORS 163.680 (1987), i.e., the focus on sexual abuse of children, set the statute apart from the type of anti-obscenity laws that this court held to be invalid restrictions on speech in City of Portland v. Tidyman, 306 Or. 174, 759 P.2d 242 (1988), and State v. Henry, 302 Or. 510, 732 P.2d 9 (1987)?[6]
To answer that question, we begin, as did the court in Henry, by noting the breadth of our state's constitutional guarantee of free expression. The text of that guarantee extends not only to written and spoken communications, but also to verbal and nonverbal expressions in film, photographs, and the like. Henry, 302 Or. at 515, 732 P.2d 9. It embodies a right to be free of restrictions that are "written in terms describing the forbidden content of [the expression.]" Tidyman, 306 Or. at 179, 759 P.2d 242. Put differently, Article I, section 8,
"forecloses the enactment of any law written in terms directed to the substance of any `opinion' or any `subject' of communication, unless the scope of the restraint is *539 wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach."
State v. Robertson, 293 Or. 402, 412, 649 P.2d 569 (1982).
The state first argues that, because the welfare of children is at stake, we should apply a different, and less stringent, rule than the one stated above. In particular, the state urges us to follow federal constitutional jurisprudence by balancing the state's strong interest in protecting children against the relatively insignificant burden that the statute imposes on free expression. In support of that argument, the state adverts to various comments embedded in the opinions issued by this court, each of which purportedly supports the notion that Article I, section 8, is, at times, susceptible to judicial balancing. See, e.g., In re Fadeley, 310 Or. 548, 561, 802 P.2d 31 (1990) (free speech "may be curtailed, for example, in the regulation of certain professions"); Tidyman, 306 Or. at 192, 759 P.2d 242 (Gillette, J., concurring in part and specially concurring in part) ("The right of the city, a county or the state to enact legislation to protect the welfare of children approaches the plenary.").
We think, however, that the balancing approach for which the state contends is so contrary to the principles that have guided this court's jurisprudence respecting freedom of expression issues under Article I, section 8, that it cannot be countenanced. It is axiomatic that, among the various interests that the government of this state seeks to protect and promote, the interests represented by the state constitution are paramount to legislative ones. Consequently, a state legislative interest, no matter how important, cannot trump a state constitutional command. See Oregonian Publishing Co. v. O'Leary, 303 Or. 297, 305, 736 P.2d 173 (1987) ("The government cannot avoid a[n unqualified] constitutional command by `balancing' it against another of its obligations."); see also Deras v. Myers, 272 Or. 47, 54 n. 6, 535 P.2d 541 (1975) (suggesting that balancing approach is incompatible with Oregon's freedom of expression guarantee). Article I, section 8, does guarantee freedom of expression without qualification"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever" (emphasis added)and is, consequently, incompatible with a balancing approach.
We reject the state's suggestion that we abandon the rule that the court traditionally has employed in resolving Article I, section 8, issues, in recognition of the particular importance of the legislative objective at issue here. We must, and will, apply that rule to resolve the free speech issue that is now before us.[7]
We begin that exercise by deciding whether ORS 163.680 (1987) was on its face "written in terms directed to the substance of any `opinion' or any `subject' of communication." Robertson, 293 Or. at 412, 649 P.2d 569. A statute that is so written is invalid on its face, unless it fits "wholly" within some "historical exception." Id.[8]
If the enactment's restraint on speech or communication lies outside an historical exception, then a further inquiry is madewhether the actual focus of the enactment is on an effect or harm that may be proscribed, rather than on the substance of the communication itself. If the actual focus of the enactment is on such a harm, the legislation may survive scrutiny under Article I, section 8. See discussion infra at 545-46, *540 920 P.2d at 540-41; State v. Moyle, 299 Or. 691, 695, 705 P.2d 740 (1985) (so holding); see also Tidyman, 306 Or. at 184, 759 P.2d 242 (coercion statute at issue in Robertson was valid because it forbade compelling or inducing unwilling behaviorthe harmful effectby means of specified kinds of threats; it did not forbid threats as such). If such a statute expressly prohibits certain forms of expression, it must survive an overbreadth inquiry before it can be found constitutional.
Even statutes that do not by their terms implicate speech or expressioni.e., statutes that are by their terms aimed only at "effects"also are subject to challenge under Article I, section 8, on vagueness grounds or on the ground that the statute's reach, as applied to defendant, extends to privileged expression. State v. Plowman, 314 Or. 157, 164, 838 P.2d 558 (1992); Robertson, 293 Or. at 417-18, 649 P.2d 569. Finally, and even if a restraint on freedom of speech or expression cannot be justified under any of the foregoing considerations, it may nonetheless be justified under the "incompatibility exception" to Article I, section 8. See, e.g., In re Lasswell, 296 Or. 121, 125-26, 673 P.2d 855 (1983) (incompatibility of full range of expression with obligations of particular public office).[9] We now proceed with our step-by-step inquiry.
The Court of Appeals majority concluded that ORS 163.680 (1987) focused on the content of the films and photographs that it described and invalidated the statute on that ground. Stoneman, 132 Or.App. at 143-44, 888 P.2d 39. In so holding, that court first discussed the difference between statutes that are directed at speech itself and those that are directed at harmful effects. It concluded that, because the statute described and proscribed communicative materials that depict children engaged in sexually explicit conduct and, more importantly, because the statute made no mention of preventing any supposed harmful effects, ORS 163.680 (1987) necessarily focused on the content of speech. Id.[10]
The flaw in that analysis is that it asks more of the statute in question than is required by Article I, section 8. It is true, as the Court of Appeals recognized, that the universe of statutes may be divided initially into two categoriesthose that focus on the content of speech and those that focus on the effect of speech. But, as the summary of our methodology's four steps indicates, a reviewing court's work is not over when a statute is placed into one or another of those general classifications. Because the statute in question described and prohibited commerce in certain forms of communication, it must be examined under one or the other of the first two categories identified in Robertson and reiterated in Plowman.
Under the first category, the statute could pass constitutional muster only if the restraint that it imposed falls "wholly" within some historical exception. The state points to and relies on Statutes of Oregon 1854, chapter XI, section 10, pp 210-11, as establishing an "historical exception."[11] That territorial law was directed at persons who "import, print, publish, sell or distribute [matter] containing obscene language or obscene prints * * * manifestly tending to the corruption of the morals of youth." But, as this court noted in Henry, that territorial statute "contained no definition of `obscene' and * * * was directed primarily to the protection of youth." 302 Or. at 522, 732 P.2d 9. Consequently, this court concluded in Henry *541 that the territorial statute provided no support for any "well-established historical exception to freedom of expression." Id. We agree with the Court of Appeals majority that, without more, that territorial statute did not sufficiently and clearly establish an historical exception within which the statute under review in the present case could be said "wholly" to fall. Stoneman, 132 Or.App. at 147, 888 P.2d 39. But, while it does not establish the historical exception for which the state contends, the territorial statute does inform our inquiry concerning the alternative ground for sustaining the statute, viz., that the statute was aimed at preventing a harm.
With respect to this second category, we think that it is clear that ORS 163.680 (1987) was concerned with harm to children. The Court of Appeals majority was wrong in holding to the contrary merely because the statute did not describe the communication, the commerce in which is forbidden, specifically in terms of harmful effects. Stoneman, 132 Or.App. at 144, 888 P.2d 39. The proper focus is on what the statute did proscribe, rather than on what it did not.
It is true that, when viewed in isolation, ORS 163.680 (1987) appears to have contained a content-based proscription on expressive material. It forbade commerce in certain forms of expressionfilms, videotapes, and the likein terms of their content"sexually explicit conduct by a child under 18 years of age." But a statute cannot be read in a vacuum. An examination of the context of a statute, as well as of its wording, is necessary to an understanding of the policy that the legislative choice embodies. See PGE v. Bureau of Labor and Industries, 317 Or. 606, 610-11, 859 P.2d 1143 (1993) (first level of interpretation of statute involves examining both text and context). A closer look at the provision under examination here, within its statutory context, reveals a different focus.
We note, first, that ORS 163.680 (1987) prohibited commerce in material, the production of which necessarily involves harm to children.[12] In fact, it is that aspect of the films and photographs described in ORS 163.680 (1987), i.e., their relationship to harm to children, rather than their communicative substance, that sets them apart. In other words, ORS 163.680 (1987) prohibited the purchase of "visual reproduction[s] of sexually explicit conduct by a child under 18 years of age," not in terms of the content of those reproductions, but because they owe their very existence to the commission of sexual abuse of a child and are, consequently, an extension of that harmful actone that may, in many instances, provide an economic incentive to abuse the child.
The legislature's enactment of ORS 163.683 (1987), which had the effect of modifying ORS 163.680 (1987), is relevant to the foregoing distinction. ORS 163.683 (1987) provided:
"It is an affirmative defense in any prosecution under ORS 163.680 alleging the obtaining or viewing of a photograph, motion picture, videotape or other visual reproduction of sexually explicit conduct by a child that the production of the photograph, motion picture, videotape or other visual reproduction did not violate laws prohibiting production of such visual reproductions in the jurisdiction where it was produced and that, if imported into the United States, was done so lawfully."[13]
That is, ORS 163.683 (1987) established that it was legal to purchase a visual reproduction whose "substance" is identical to that of the material described at ORS 163.680 (1987), so long as that reproduction is not the product *542 of an act of actual sexual abuse of a child. ORS 163.680 (1987) thus was directed at commerce in the materials described in the statute only because they are the products of sexual exploitation of children. Its constitutionality must be reviewed in that light.
Other parts of the context in which ORS 163.680 (1987) was found confirm that the statute was directed at discouraging the underlying harm caused by child sexual abuse, rather than at the substance of the films and photographs that are described therein. ORS 163.680 (1987) was only one provision among several devoted to visual recording of sexual conduct by children. That part began with a definition of "sexually explicit conduct" at ORS 163.665 (1987), set out above at note 4, and then at ORS 163.670 (1987), which forbade the use of children in displays of sexually explicit conduct:
"(1) A person commits the crime of using a child in a display of sexually explicit conduct if the person employs, authorizes, permits, compels, and or induces a child under 18 years of age to participate or engage in sexually explicit conduct for any person to observe or to record in a photograph or other visual recording.
"(2) Violation of subsection (1) of this section is a Class A felony."[14]
ORS 163.670 (1987) described the basic and most serious kind of harm covered by this part of the criminal code[15] and set out the theme that is common to a variety of subsidiary offenses that are described in the remainder of that part: the state's determination to deter the harm that arises from participation of children in sexually explicit conduct for the purpose of visual recording.
For example, ORS 163.673 (1987) prohibited "dealing in" visual recordings of children under 18 years of age engaged in sexually explicit conduct, while ORS 163.677 (1987) prohibited the knowing transport into the state of visual depictions of children engaged in such conduct.[16] Another provision, ORS 163.693 (1987), penalized failure to report visual recordings of children under the age of 18 engaged in sexually explicit conduct by persons involved in processing and producing them,[17] while ORS 163.680 (1987), the provision at issue here, prohibited payment to obtain or view such depictions.
The consistent repetition of the legislature's theme establishes that, not only the basic forbidden act described at ORS 163.670 (1987), but the entire part of the criminal code in which that statute is found, was aimed at preventing and punishing conduct the subjection of children under 18 years of age to sexual exploitation for the purposes of visual recording. Although the various subsidiary activities described in that portion of the lawdistribution, purchase, and transport of the resulting photographs and videotapesinvolve communication, the legislative focus was not on the message or "substance" of the photographs and videotapes but, rather, on their undeniable relationship to the underlying acts of sexual exploitation of children.
We conclude that ORS 163.680 (1987) prohibited the purchase of certain communicative materials, not in terms of their communicative substance, but in terms of their status as the products of acts that necessarily have harmed the child participants. So understood, it will be seen that the statute punished sexual exploitation by commerce that is a continuation and an integral part of the underlying harmful acts.
The foregoing conclusion leaves us with a single question: May the legislature regulate commerce in communicative products derived from actual sexual exploitation of children? We have little difficulty in concluding that the legislature may do so, where the manufacture of those products for distribution *543 and eventual purchase provides the very raison d'etre for engaging in the underlying acts of child sexual abuse.[18] A state's authority to forbid direct harm to children includes the authority to destroy the incentives for causing that harm,[19] at least when the incentive is to sell to others a visual reproduction of the harmful act itself.[20]
ORS 163.680 (1987) was not directed at the substance of any opinion or subject of communication but was, instead, directed at protecting children from sexual exploitation. As such, it did not violate Article I, section 8, by its direct terms. Still, because it expressly prohibited a certain form of expression, we must determine whether it reached expression that enjoys the protections afforded by Article I, section 8. If its apparent reach extended to privileged expression and it cannot be interpreted narrowly to avoid privileged expression, then it is overbroad and invalid. Plowman, 314 Or. at 164, 838 P.2d 558; Robertson, 293 Or. at 417-18, 437, 649 P.2d 569.
We already have noted that ORS 163.680 (1987) prohibited commerce of a very limited pool of communicative materialsthose whose production and, by extension, use, necessarily involve the harming of a child. Article I, section 8, does not require the state to tolerate sexual abuse of children. ORS 163.680 (1987) went no further than to punish commerce that is a direct fruit of that abuse. So understood, the reach of ORS 163.680 (1987) was narrowly tailored to reach only forbidden effects and did not extend to privileged expression.
We hold that Article I, section 8, of the Oregon Constitution, does not prohibit the legislature from protecting children from sexual exploitation, even when that exploitation ultimately is shared with others through some expressive device. ORS 163.680 (1987) *544 was constitutionally valid.[21] The Court of Appeals erred in concluding otherwise.
The decision of the Court of Appeals is reversed. The case is remanded to the circuit court for further proceedings.
DURHAM, Justice, dissenting.
I agree with several of the conclusions that the majority reaches in its analysis of this case and therefore mention them briefly. I join in the majority's rejection of the state's invitation to incorporate a balancing of competing interests into this court's Article I, section 8, jurisprudence. I agree that the rights protected by Article I, section 8, apply to verbal and nonverbal expression in films, photographs, videotapes, and similar media.[1] I also concur that the state has failed to satisfy the historical exception analysis described in State v. Robertson, 293 Or. 402, 412, 649 P.2d 569 (1982).
However, the majority gets off on the wrong foot by declaring that ORS 163.680 (1987)[2] restrained only the effects of speech, not speech itself, and only effects that necessarily cause harm to children. Important statutory terminology that the majority refuses to confront demonstrates that the majority's construction is erroneous. That error in statutory construction leads the majority to an incorrect constitutional analysis. Those errors compel me to dissent.
I turn first to the issue of the proper construction of ORS 163.680 (1987). Before we test any statute for compliance with constitutional requirements, it is imperative that we accurately discern the specific prohibition that the statute embodies. The majority forgets that our task is to interpret the statute that the legislature enacted, not to reform the statute and give it a different meaning in order to simplify this court's constitutional inquiry.
The obstacle that defeats the majority's proposed construction of ORS 163.680 (1987) is the word "simulated" in the definition of "sexually explicit conduct" in ORS 163.665(3) (1987).[3] That term in the statutory definition is critical to a proper understanding of the kinds of films to which the statute applied.
In overview, ORS 163.680 (1987) criminalized commerce in certain films if they exhibited a child engaged in "sexually explicit conduct."[4] ORS 163.665 (1987) specially defined *545 "sexually explicit conduct" as "actual or simulated" (emphasis added) sexual behavior of the kinds listed in the statute. Thus, ORS 163.680 (1987) criminalized paying to see a film that purports to display a child engaged in a sexual act when, in reality, the child's involvement is a "simulation."
The majority fails to address the significance of the term "simulated" in the statutory definition beyond its imponderable ipse dixit that "[m]oreover, the child's participation in the act must be real, i.e., the sexual act may be `simulated,' but the child's participation in that act cannot be." 323 Or. at 540, 920 P.2d at 538 (emphasis in original). That statement evades both the words of the statutory definition and their plain meaning.
A dictionary defines "simulated" as:
"[O]f a feigned or imitative character: MOCK, SHAM * * *." Webster's Third New Int'l Dictionary, 2122 (1993).
The noun form of the term, "simulation," is defined as:
"1a: the act or process of simulating: IMITATION, PRETENSE * * * b: a sham object: COUNTERFEIT * * * 2: willful deception: COLLUSION, MISREPRESENTATION 3: one that shows a superficial resemblance: ANALOGUE * * *." Id.

In addition to applying those definitions, we are bound to give effect to the other words in the statutory phrase in question, "actual or simulated." The term "simulated" applies to all visual representations that do not involve "actual" sexual conduct. The conjunction "or" signifies that the definition applies equally to visual representations of "actual" and "simulated" sexual acts or any combination of those two categories. Properly understood in view of the ordinary meaning of the statutory terms, the phrase "actual or simulated" incorporated the full spectrum of visual representations of sexual conduct, ranging from those that involve genuine sexual behavior in their production (that is, "actual") to those that consist entirely of a false pretense or misrepresentation of the occurrence of a sexual act when, in fact, no sexual act of any kind occurs during their production (that is, "simulated"). Between those poles, the phrase, in substance, includes any visual representation that appears to display a listed sexual act whether or not the production involves actual sexual conduct by the persons portrayed on film.
The word "simulated" in this context embodies a restriction that is remarkable in its requirementcompelled by every dictionary definition of that termthat the film be one that misrepresents the occurrence of a sexual act. The production of some visual representations of a simulation of a sexual act by a child could involve the child in conduct that actually harms the child. However, the statute did not specify in terms, as an object of regulation, either the films that fall in that category or any harm to children that their creation entails. That is no inconsequential legislative oversight, particularly in the context of speech regulation, where clarity of expression is a constitutional value of the highest order. The legislature cannot forbid all speech about a "simulation" of a subject of expression and thrust on the court the task of scavenging the dictionary for any possible way to read the restriction to save its constitutionality. That is less the proper interpretation of the ordinary meaning of the legislature's terminology than the substitution of the court's own preconception of a proper restriction on sexually explicit speech.
*546 Contrary to the majority's premise, we cannot say that every visual representation of a child in a simulated sexual act necessarily depends for its existence on conduct that harms the child. In the latter context, a simulation may consist entirely of film images that portray a real child engaged in what appears to be sexual conduct but what is, in reality, not sexual or otherwise harmful conduct. For example, a film may portray a realistic image of what appears to be a sexual act by a child when, in reality, the image is a mere simulation created from film of an actual child innocently playing, dancing, or sleeping while fully clothed. In that circumstance, the conduct of both the child and film producer is perfectly lawful and not harmful to the child, yet the statute criminalized commerce in such a film.
Only by misconstruing the statute can the majority evade the restraint on expression that the statute embodies. The majority construes the phrase "actual or simulated" to mean "actual." As a result, the majority concludes that the statutory definition of "sexually explicit conduct" extends only to visual representations that involve "actual" abuse of children. I cannot imagine a more obvious instance of an appellate court failing to come to grips with the best evidence of the legislature's intention: the statute's words.
The majority purports to find support for its statutory interpretation in a review of statutes other than ORS 163.680 (1987). I do not agree. The correct focus is on the terms of ORS 163.680, not other laws. Additionally, the majority's review of the "context" of ORS 163.680 is unpersuasive. ORS 163.683 (1987) created a defense to a prosecution under ORS 163.680 (1987) if production of the film did not violate "laws prohibiting production of such visual reproductions in the jurisdiction where it was produced * * *." That statutory defense depends on the absence of a law forbidding such visual reproductions in some other jurisdiction. It does not, by its terms, require that actual abuse of a child occur during the production. In fact, the phrase "such visual reproductions" in the statute incorporated the prior phrase "sexually explicit conduct," ORS 163.665 (1987), which, in turn, encompassed "simulated" sexual acts. The other statutes referred to by the majority, ORS 163.670 (1987), 163.673 (1987), and 163.693 (1987), also depended on the statutory definition of "sexually explicit conduct" in ORS 163.665 (1987). Such circular reasoning adds nothing, let alone contextual support, to the majority's statutory analysis.
The majority's misconstruction of the statute leads it to commit other significant errors of constitutional magnitude. The majority holds that the statute did not focus on the content of films and photographs but, instead, focused on a harmful effect of those communicative materials, the "actual" sexual abuse of children. See State v. Stoneman, 323 Or. at 546, 920 P.2d at 541 ("ORS 163.680 (1987) prohibited commerce in material, the production of which necessarily involves harm to children") (original emphasis; footnote omitted).
The flaw in that logic is that the statute, by its terms, equally punished commerce in material, the production of which involves either a genuine sexual act or a pure misrepresentation of the occurrence of a sexual act. A "simulated" sexual act is, by definition, one in which no actual sex act occurs. The majority fails to explain how a simulation that involves no sexual activity by a child necessarily involves actual sexual abuse of a child.
The majority attempts to rationalize its answer by effectively erasing the words "or simulated" from the statute. We are forbidden to do that. ORS 174.010 provides:
"In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted * * *." (Emphasis added.)
The majority's evasion of the actual focus of the statute permits it to set up a false issue (viz., "[m]ay the legislature regulate commerce in communicative products derived from the actual sexual exploitation of children?") 323 Or. at 549, 920 P.2d at 542 and then knock it down. If the answer to that question seems to be obvious, it is because the majority's question itself misstates the *547 true issue in order to achieve an easy answer. No one benefits from simplistic answers to complex constitutional questions.
The Court of Appeals held (correctly in my view) that ORS 163.680(1) (1987) was a content-based restriction on expressive material. State v. Stoneman, 132 Or.App. 137, 143-44, 888 P.2d 39 (1994). It proscribed commerce in certain films and other visual representations because of their content. That conclusion seems inescapable, because films that contain images of children engaged in conduct outside the definition in ORS 163.665 (1987) ("sexually explicit conduct") were not regulated. Under State v. Robertson, 293 Or. 402, 412, 649 P.2d 569 (1982), and its progeny, a content-based restriction on speech violates Article I, section 8, unless it satisfies this court's "historical exception" doctrine. I agree with the majority that ORS 163.680 (1987) did not qualify as a historical exception. Under the rationale stated in Robertson and City of Portland v. Tidyman, 306 Or. 174, 759 P.2d 242 (1988), ORS 163.680 (1987) violated Article I, section 8.
The state contends that the statute qualified as a valid regulation of a harm of speech, because it protected children from the effects of child abuse in the production of films and similar materials. I agree that a law may forbid speech if it specifies expressly or by clear inference the serious and imminent effects that it is designed to prevent. See Moser v. Frohnmayer, 315 Or. 372, 379, 845 P.2d 1284 (1993) (stating principle).
ORS 163.680 (1987) fails that test, because its words restrained films that portray a simulation of sexual conduct, that is, conduct that, by definition, involves no actual sexual activity. The state has not demonstrated, as it must in order to sustain the statute, that a child's involvement in such a simulation in the course of making a film poses any risk of harm to the child, let alone the serious and imminent harm that the Moser test requires.
The Court of Appeals correctly relied on Tidyman in striking down this statute. In Tidyman, this court declined to examine prefatory findings that accompanied an adult book store ordinance to discern the types of harm that the ordinance purportedly restrained. Examination of the operative text of ORS 163.680 (1987) similarly discloses no clear specification of a proscribed harm. Any attempt to draw the inference that the statute was intended only to restrain films that necessarily harm children is defeated by its explicit focus on films that display a simulation of a sexual act. Nothing in the statute's text or context remotely suggests that the statute was limited only to simulations that involve actual harm to children.
If a statute restrains privileged speech but also restricts harmful effects, such as child abuse, that the legislature may proscribe, we must determine whether we can interpret the statute to avoid such overbreadth. Robertson, 293 Or. at 418, 649 P.2d 569. I conclude that this court cannot rid ORS 163.680 (1987) of its overbreadth by interpretation. Two factors are significant to my analysis. First, the legislature expressed its restriction in terms of the content of certain speech, not a harm necessarily resulting from speech. Second, the legislature expressly restrained films portraying any simulation of a sexual act and did not in terms confine the statute to films that portray actual child sexual conduct. Any attempt to excise from the statute the legislature's policy choice to restrain films that simulate sexual conduct would produce a markedly different statute bearing no resemblance to ORS 163.680 (1987). That sort of radical surgery on a statute is not this court's proper task.[5]
In conclusion, ORS 163.680 (1987) satisfied none of the rules that this court observes in scrutinizing statutes challenged under Article *548 I, section 8. The trial court did not err in sustaining defendant's demurrer to the indictment.
I dissent.
NOTES
[*] Unis, J., retired June 30, 1996, and did not participate in this decision.
[1] ORS 163.680 was amended in 1991 in minor ways that are not relevant to this case. Or Laws 1991, ch 664, § 8. In 1995, the legislature repealed ORS 163.680 as part of an overall revision of the laws relating to visual reproductions of child sexual conduct. Or Laws 1995, ch 768, § 16. The purchase of visual reproductions of child sexual conduct is now prohibited under a new section pertaining to "encouraging child sexual abuse." Or Laws 1995, ch 768, § 3 (ORS 163.686 (1995)).
[2] Article I, section 8, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."
[3] Defendant argued below that the term "visual reproduction" in ORS 163.680 (1987) could apply to paintings, drawings, and other "renderings from imagination rather than life." We disagree. Under the principle of ejusdem generis, that term is limited to media that, like other media listed in the statutei.e., photographs, motion pictures, and videotapesreproduce actual events involving children taking part in the acts being portrayed.
[4] In 1990, "sexually explicit conduct" was defined as "actual or simulated:

"(1) Sexual intercourse or deviant sexual intercourse;
"(2) Genital-genital, oral-genital, anal-genital or oral-anal contact, whether between persons of the same or opposite sex or between humans and animals;
"(3) Penetration of the vagina or rectum by any object;
"(4) Masturbation;
"(5) Sadistic or masochistic abuse; or
"(6) Lewd exhibition of the genitals or anus."
ORS 163.665(3) (1987). In 1991 and again in 1995, ORS 163.665(3) was amended in minor ways not relevant to this case.
[5] The dissent takes a completely different view of the meaning and scope of the word "simulated." Even if we were to agree that the dissent's interpretation of the word were a reasonable one and, reading the word in its statutory text and context, we do notthe dissent's argument would not go where the dissent wishes to go. Two plausible readings would require this court to resort to legislative history. PGE v. Bureau of Labor and Industries, 317 Or. 606, 611-12, 859 P.2d 1143 (1993). The dissent presents no historyand we know of noneto support its theory. That circumstance then would lead us to resort to general maxims of statutory construction. Id. at 612, 859 P.2d 1143. One such maxim is that a court will give a statute such an interpretation as will avoid constitutional invalidity. See, e.g., Salem College & Academy, Inc. v. Emp. Div., 298 Or. 471, 481, 695 P.2d 25 (1985) (so holding). We already have achieved such an interpretation by our first-level analysis.
[6] In Henry, this court concluded that expression cannot be outlawed solely on the ground that it is obscene. 302 Or. at 525, 732 P.2d 9. However, the court left open the possibility that obscenity could be regulated, like other forms of expression, under "reasonable time, place and manner regulations of the nuisance aspects of such material, or laws to protect the unwilling viewer or children." Id. (Emphasis added.) A year later, in Tidyman, this court invalidated a City of Portland zoning ordinance directed at "adult" bookstores and movie theaters, because we held that the city's claim that the ordinance focused on the effects of speech, rather than on its substance, was incorrect. 306 Or. at 185-86, 759 P.2d 242.
[7] The foregoing conclusion rejects the state's contention that the reference in Henry, 302 Or. at 525, 732 P.2d 9, to the protection of children should result in a balancing test. Nothing in this opinion, however, should be construed to reflect on the continuing vitality of the implication in Henry, id. at 521-22, 525, 732 P.2d 9, that the protection of children may constitute an historical exception when assessing the scope of Article I, section 8, thereby removing any state constitutional bar to a statute that is directed at the content of speech but that also falls within the ambit of the exception.
[8] Of course, an enactment may fit only partly within an historical exception. In such a case, the enactment still must be scrutinized and invalidated to the extent that it forbids privileged speech or expression.
[9] The "incompatibility exception" is not implicated in this case.
[10] The Court of Appeals likened ORS 163.680(1) to the ordinance at issue in City of Portland v. Tidyman, 306 Or. 174, 759 P.2d 242 (1988). That ordinance prohibited "adult businesses" from locating near residential areas and schools. Although the ordinance contained prefatory findings reciting the deleterious effects that adult businesses cause if located in residential areas, it did not include those effects as an element of the regulatory standard. We held that the statute was an invalid content-driven restriction on speech, because the operative text of the statute described the forbidden businesses in terms of the content of their communicative products and did not specify effects that must occur or imminently threaten to occur if the statute were to apply. 306 Or. at 185, 759 P.2d 242.
[11] One of the dissenting opinions in the Court of Appeals agreed with that argument. State v. Stoneman, 132 Or.App. 137, 156-62, 888 P.2d 39 (1994) (Edmonds, J., dissenting).
[12] Subjecting children to sexual conduct is a crime under a number of Oregon statutes. Under ORS 163.427 (Sexual Abuse in the First Degree), it is a Class B felony to subject another person to sexual contact if the victim is less than 14 years of age. Under ORS 163.415 (Sexual Abuse in the Third Degree), it is a Class A misdemeanor to subject another person to sexual contact if the victim is incapable of consent by reason of being under 18 years of age. Under ORS 163.435 (Contributing to the Sexual Delinquency of a Minor), it is a Class A misdemeanor to engage in sexual intercourse with a person under 18 years of age, or to cause such a person to engage in deviate sexual intercourse with another person.
[13] ORS 163.683 (1987) was repealed by Or. Laws 1991, ch. 664, § 12.
[14] ORS 163.670 (1987) was amended by Or. Laws 1991, ch. 664, § 5.
[15] While we speak here of criminal statutes, because ORS 163.680 (1987) is a part of the criminal code, it is not the criminality of the forbidden conduct that is pivotal to our analysis. What is pivotal is the fact that the forbidden conduct necessarily involves harm to children.
[16] Both ORS 163.673 (1987) and ORS 163.677 (1987) were repealed by Or. Laws 1995, ch. 768, § 16.
[17] ORS 163.693 (1987) was amended by Or. Laws 1991, ch. 664, § 10, in minor ways not relevant to this case.
[18] This conclusion is consistent with the rationale of City of Eugene v. Miller, 318 Or. 480, 871 P.2d 454 (1994). Miller indicates that legislation is not immunized from Article I, section 8, scrutiny by the mere fact that it regulates expressive material as it does any other commodity:

"The city also is wrong when it contends that `the analysis in this case is the same whether the commodity involved is joke books or furniture.' A limitation on the sale of furniture does not implicate the same free speech concerns that are implicated by a limitation on the sale of goods that are themselves protected as expression under Article I, section 8."
318 Or. at 487, 871 P.2d 454. However, Miller does not suggest that legislation affecting commerce in the communicative by-products of child sexual abuse implicates the protections of Article I, section 8.
[19] See, e.g., Laurence Tribe, American Constitutional Law, ch. 12, §§ 12-16, 915 n. 71 (2d ed. 1988):

"Until recently, research and writing stressed, for example, the rather tenuous link to crime by the viewer or reader of the obscene. Consistently overlooked as a rationale for banning at least some types of films had been the link to crime by the persons being filmed. Governmental power to prevent murder, rape, and child abuse, for example, should imply power to destroy the primary economic incentive for a distinct category of abusive acts: the desire to film the criminal abuse itself for the titillation of a potential audience jaded by its satiation with other sights and sounds. Although governments cannot be allowed the circular argument that films of consenting adult sex should be banned in order to diminish an economic incentive for fornication that might be too private to be punishable but for the fact that the acts are being filmed for viewing by others, no circle is involved when the argument is applied to films of child torture and mutilation. * * * It should be noted that this rationale does not apply to descriptions as opposed to actual photographs or recordings. Nor does it apply to films of simulated acts, or to films of conduct causing no harm other than that supposedly caused by the act of viewing." (Emphasis in original.)
[20] We note that various federal lawsfor instance, the laws forbidding copyright infringement and commerce in trade secretsregulate communicative material under the foregoing rationale. See American Booksellers Ass'n, Inc. v. Hudnut, 771 F.2d 323, 332 (7th Cir.1985) (noting that a motion picture that is the product of coerced activity could be banned as part of the underlying coercion.) aff'd, 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986); New York v. Ferber, 458 U.S. 747, 761-62, 102 S.Ct. 3348, 3357, 73 L.Ed.2d 1113 (1982) (stating that child pornography may be regulated as an integral part of the abuse that produced that pornography, and quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498, 69 S.Ct. 684, 688, 93 L.Ed. 834 (1949): "`It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.'").
[21] We emphasize again that the permissible reach of this statute extended only so far as is required for the protection of children from the harm inherent in sexual exploitation.
[1] In this opinion, I use the word "film" to refer to all forms of visual reproduction that are included within the coverage of ORS 163.680(1) (1987), which is quoted in footnote 2 below.
[2] ORS 163.680 (1987) provided:

"(1) It is unlawful for any person to pay or give anything of value to observe sexually explicit conduct by a child known by the person to be under 18 years of age, or to pay or give anything of value to obtain or view a photograph, motion picture, videotape or other visual reproduction of sexually explicit conduct by a child under 18 years of age."
"(2) Violation of subsection (1) of this section is a Class C felony."
[3] ORS 163.665 (1987) provided:

"As used in ORS 163.670 to 163.690, `sexually explicit conduct' means actual or simulated:
"(1) Sexual intercourse or deviant sexual intercourse;
"(2) Genital-genital, oral-genital, anal-genital or oral-anal contact, whether between persons of the same or opposite sex or between humans and animals;
"(3) Penetration of the vagina or rectum by any object;
"(4) Masturbation;
"(5) Sadistic or masochistic abuse; or
"(6) Lewd exhibition of the genitals or anus."
[4] The roots of ORS 163.665 (1987) are not clear. The Oregon legislature may have derived that statute from the statute challenged in New York v. Ferber, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). In Ferber, the Supreme Court upheld, against a First Amendment challenge, a New York statute that criminalized the use of a child in a sexual performance. The New York Court of Appeals had struck down the statute as an infringement of protected speech. The statute incorporated a special definition of a statutory term, "sexual conduct," that said:

"`Sexual conduct' means actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals."
The Court did not address the significance, under the First Amendment, of the term "simulated" in the definition except to state, without explanation:
"We note that the distribution of descriptions or other depictions of sexual conduct, not otherwise obscene, which do not involve live performance or photographic or other visual reproduction of live performances, retains First Amendment protection." Id., 458 U.S. at 764-65, 102 S.Ct. at 3358.
Moreover, the First Amendment overbreadth analysis followed in Ferber bears little resemblance to this court's overbreadth analysis under Article I, section 8. See State v. Robertson, 293 Or. 402, 410, 649 P.2d 569 (1982) (describing Oregon's overbreadth analysis).
Following the decision in Ferber, the Oregon legislature adopted ORS 163.665 (1985), which defined "sexual conduct" to mean
"actual or simulated sexual intercourse, including genital-genital, oral-genital, anal-genital or oral-anal intercourse; bestiality; masturbation; sadistic or masochistic abuse; or lewd exhibition of the genitals."
ORS 163.665 (1987) modified that list of sexual acts but retained the introductory phrase, "actual or simulated."
[5] I do not contend, as the majority asserts, 323 Or. at 540 n. 5, 920 P.2d at 538 n. 5 that the majority has chosen a plausible but incorrect interpretation of the term "simulated." Rather, by interpreting the term "simulated" to mean only visual representations produced through actual child abuse, the majority adopts a reading of that term that is implausible, because it contradicts every ordinary definition of that term. Thus, the majority substitutes its policy choice for that adopted by the legislature. The majority's suggestion that it might be able to reach the same conclusion by interpreting the statute to avoid its constitutional invalidity fails to demonstrate that the majority's construction would conform to the legislature's policy choice and, in any event, would pass muster under this court's overbreadth methodology.